INTERNATIONAL & G. N. RY. CO. v. ANDERSON COUNTY et al.

(Court of Civil Appeals of Texas. Galveston. June 20, 1912. Rehearing Denied Oct. 17, 1912.)

1. INJUNCTION (§ 111*)—VENUE—STATUTES.
Rev. St. 1895, arts. 2995, 2996, directing that on the granting of an injunction the party to whom the same is granted shall file his petition therefor with the order granting the same with the clerk of the proper county, and providing that writs for injunction for causes other than to stay proceedings in a suit or execution on a judgment shall be returnable to and tried in the proper court of the county in which defendant has his domicile, fix the venue of suits for injunction for causes other than to stay proceedings in a suit or execution on a judgment in the county of the domicile of defendant.
[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 195, 196; Dec. Dig. § 111.*]

2. INJUNCTION (§ 111*)—VENUE—STATUTES.
Under Rev. St. 1895, art. 1194, subd. 27, providing that, when in any law authorizing any particular character of action the venue is expressly prescribed, the suit shall be commenced in the county to which the jurisdiction may be given, and articles 2995 and 2996, providing that writs for injunction shall be returnable to and tried in the county in which defendant has his domicile, a suit against a railroad company for injunctive relief only can only be brought in the county in which the corporation has its domicile.
[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 195, 196; Dec. Dig. § 111.*]

3. RAILROADS (§ 22*) — ACTIONS — VENUE — PLEADINGS.
A petition in a suit by a county and a city and citizens of the city against a railroad company to restrain it from removing its machine shops, roundhouses, and general offices from the city, which sets forth a contract binding a railroad company under which defendant claims to maintain such establishments in the city, and which alleges that defendant is required by law to keep and maintain such establishments in the city, shows that defendant is under a contract, but does not allege that defendant's domicile is in the county so as to deprive it of its rights to have the suit tried in the county of its domicile.
[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 46–50; Dec. Dig. § 22.*]

4. VENUE (§ 16*)—JOINDER OF CAUSES OF ACTION.
Where two causes of action are properly joined, the suit may be brought in the county in which a suit on either of the causes of action may be commenced.
[Ed. Note.—For other cases, see Venue, Cent. Dig. §§ 23–27; Dec. Dig. § 16.*]

5. VENUE (§ 15*) — JOINDER OF CAUSES OF ACTION—"SUIT FOR INJUNCTION."
Where the injunction applied for is merely ancillary to the main purpose of the suit, the suit is not a suit for injunction within Rev. St. 1895, art. 2996, providing that writs for injunction shall be returnable to and tried in the county in which defendant has his domicile.
[Ed. Note.—For other cases, see Venue, Cent. Dig. § 22; Dec. Dig. § 15.*]

6. RAILROADS (§ 22*) — ACTIONS — VENUE — PLEADINGS.
A petition in an action by a county and a city and citizens of the city against a railroad company to restrain the company from removing from the city its machine shops, roundhouses, and general offices, which alleges that a company under which defendant claims title contracted to maintain such establishments in the city to induce the electors of the county to authorize the issuance and delivery of bonds, that the county issued bonds, that the company located such establishments in the city, that such establishments were maintained in the city for many years, and that defendant in disregard of the obligations of the contract undertook to change the location of such establishments, and which prays for an injunction to restrain defendant from changing the location of the establishments, states a cause of action for specific performance of the contract, and the injunction prayed for is only ancillary, and the suit can be brought in the county in which defendant maintains a line of road.
[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 46–50; Dec. Dig. § 22.*]

7. RAILROADS (§ 46*)—LOCATION OF MACHINE SHOPS AND GENERAL OFFICES—CONTRACTS—VALIDITY.

Paschal's Dig. art. 4888, authorizing railroad corporations to establish a principal office at some point on the line of its road and to change the same at pleasure, giving public notice thereof, recognizes the right of a railroad corporation to change the location of its general offices to suit its convenience, but it does not limit the right of a railroad corporation to make a contract for the permanent location of its machine shops, roundhouses, and general offices of its superintendent of motive power and machinery.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 105; Dec. Dig. § 46.*]

8. RAILROADS (§ 46*)—LOCATION OF SHOPS—CONTRACTS—PLEADINGS.

A petition in a suit by a county, a city, and citizens thereof to restrain a railroad company from removing from the city its machine shops, roundhouses, and general offices, which alleges that a company under which defendant claimed contracted to perpetually maintain such establishments in the city in consideration of receiving bonds of the county, that bonds were issued by the county, and that the establishments were located in the city and maintained there for many years, that the railroad property subsequently passed to defendant, and it removed such establishments from the city in disregard of the contractual obligations, sufficiently showed, in the absence of special exceptions, that the railroad companies bound themselves to maintain their machine shops, roundhouses, and general offices in the city.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 105; Dec. Dig. § 46.*]

9. RAILROADS (§ 194*)—LOCATION OF OFFICES—CONTRACTS.

Where a railroad company was organized under Rev. St. 1895, art. 4550, as amended by Acts 31st Leg. c. 4, for the purchase at foreclosure sale of the property, rights, and franchises of another railroad corporation, and it purchased the same, it took title subject to the liabilities of the original company, and a contract binding the original company to maintain its roundhouses, machine shops, and general offices in a city was binding on the new company.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 643–655; Dec. Dig. § 194.*]

10. CORPORATIONS (§ 29*)—IRREGULARITY IN ORGANIZATION—PARTY ENTITLED TO QUESTION.

The validity of a corporation cannot be questioned by the corporation in a suit against it, and its legal existence as a bona fide corporation organized under a statute can only be questioned by the state.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 77, 78; Dec. Dig. § 29.*]

11. RAILROADS (§ 194*)—PURCHASE OF RAILROAD AT JUDICIAL SALE—OBLIGATION OF PURCHASER.

In the absence of any statute affecting the liability of a purchaser of a railroad sold under a judicial sale, or under a deed of trust, the purchaser acquires the property and franchises free from mere personal obligations of the former company.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 643–655; Dec. Dig. § 194.*]

12. RAILROADS (§ 194*)—PURCHASE OF RAILROAD AT JUDICIAL SALE—OBLIGATION OF PURCHASER.

Under Rev. St. 1895, art. 4367, requiring railroad companies to maintain their machine shops, roundhouses, and general offices at the place fixed by it in a contract supported by valuable consideration, the contractual obligation of a railroad company to maintain its roundhouses, machine shops, and general offices in a city, supported by a valuable consideration, is not a mere personal obligation of the company, but is an obligation imposed by law, and the obligation rests on a company purchasing the property and franchises at foreclosure sale.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 643–655; Dec. Dig. § 194.*]

13. INJUNCTION (§§ 133, 143*)—MANDATORY INJUNCTION—NOTICE.

The power of equity to grant a preliminary injunction without notice should not be exercised unless there is a pressing necessity for such action, and, as a general rule, a mandatory injunction should not be ordered before a final hearing of the case, and for the purpose of executing the judgment.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 302, 315; Dec. Dig. §§ 133, 143.*]

14. INJUNCTION (§ 143*) — MANDATORY INJUNCTION—NOTICE.

Where a railroad company obligated by contract to maintain in a city its machine shops, roundhouses, and general offices had removed the same before suit was filed to restrain the company from violating its obligation, the court should not without notice grant a mandatory injunction compelling the company to remove its general offices from their present location to the city.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 315; Dec. Dig. § 143.*]

Appeal from District Court, Anderson County; James I. Perkins, Judge.

Action by Anderson County and others against the International & Great Northern Railway Company. From an order granting a temporary injunction, defendant appeals. Reformed and affirmed.

Wilson & Dabney, of Houston, and Williams & Steadman, of Austin, for appellant. A. G. Greenwood, Campbell, Sewell & Strickland, and Thos. B. Greenwood, all of Palestine, for appellees.

PLEASANTS, C. J. This appeal is from an order of the district judge for the Second judicial district, made in chambers and without notice to appellant or opportunity on its part to be heard, granting a temporary injunction prohibiting appellant from removing its machine shops, roundhouses, and the general offices of its superintendent of motive power and machinery and its master mechanic from the city of Palestine, and commanding it to keep and maintain all of its general offices for the operation of its railroad at the city of Palestine, and within 60 days from the date of said order to return to the city of Palestine such of its general offices as were then being kept in the cities of Houston, Tex., and New Orleans, La. The suit in which this injunction was granted was brought in the district court of Anderson county in the Third judicial district, by Anderson county, the city of Palestine, and a number of named citizens of said city who allege that they sue in behalf of themselves

and of all other citizens of said city, plaintiffs, against the International & Great Northern Railway Company, defendant. The petition alleges: "That the defendant International & Great Northern Railway Company is a corporation organized under the laws of Texas, as hereinafter shown, and required by law to keep and maintain its general offices at the city of Palestine in Anderson county. That the treasurer of the defendant is A. R. Howard, who resides in the county of Anderson, Tex., but who is temporarily in Houston in Harris county, Tex. That defendant has a local agent representing it in the county of Anderson, Tex."

After alleging the incorporation on October 22, 1866, by special act of the Legislature of Texas of the Houston & Great Northern Railroad, and the incorporation on August 5, 1870, by special act of said Legislature of the International Railroad Company, the first-named company having been chartered for the purpose of constructing and operating a railroad from the city of Houston northward to Red River, and the second for the purpose of constructing and operating a railroad from Red river across the state through the cities of Austin and San Antonio to the Rio Grande river, the petition contains the following allegations:

"That, acting under said act of August 5, 1870, the International Railroad Company had, prior to the 15th day of March, 1872, constructed a portion of its line of railroad from at or near the town of Hearne, in Robertson county, Tex., to the city of Palestine, in Anderson county, Tex., and was regularly operating said line of railroad as a common carrier of freight and passengers for hire, and was maintaining a depot at said city of Palestine.

"That heretofore, to wit, on or about the 15th day of March, 1872, the Houston & Great Northern Railroad Company had constructed under its charter its line of railroad from the city of Houston northward to the north boundary line of Houston county, Tex.; and on or about said date said Houston & Great Northern Railroad Company, acting by its duly authorized president, Galusha A. Grow, contracted and agreed, in Anderson county, Tex., with the citizens of the city of Palestine, Tex., acting by and through Judge John H. Reagan, to extend its said line of railroad from the north boundary line of Houston county, to intersect the line of the International Railroad Company at Palestine, and to establish a depot within one-half mile of the courthouse at and to commence running cars regularly thereto by the 1st of July, 1873, and to thereupon locate and establish, and forever thereafter keep and maintain, the general offices, machine shops, and roundhouses of the Houston & Great Northern Railroad at the city of Palestine for and in consideration of the promise and agreement then made, upon the

150 S.W.—16

part of the said Judge John H. Reagan, to make a thorough canvass of Anderson county, to induce the electors thereof to authorize, by their votes, the issuance of the interest-bearing bonds of said county in the principal sum of $150,000, and for and upon the further consideration that Anderson county, on authorization of its electors, in the manner prescribed by law, should issue and deliver to the Houston & Great Northern Railroad Company its interest-bearing bonds in said principal sum of $150,000, upon the completion of said railroad to its intersection with the International Railroad at Palestine, and upon the establishment of a depot within a half mile of the courthouse, and upon the commencement of the running of cars regularly to such depot.

"That, if said contract did not expressly name the citizens of Palestine as parties thereto (as plaintiffs expressly aver it did), yet the same was made for their benefit and in their behalf, and such citizens at that time and throughout the future, including the plaintiffs, were the parties intended by both Judge John H. Reagan and the Houston & Great Northern Railroad Company as the parties to be benefited by the performance of all the obligations of the Railroad Company under said contract, and especially of those obligations which related to the location and maintenance of general offices, machine shops, and roundhouses at Palestine.

"That in order to induce the electors of Anderson county to authorize the issuance and delivery to the Houston & Great Northern Railroad Company of the interest-bearing bonds of Anderson county, in the principal sum of $150,000, which bonds are hereinafter more fully described, the Houston & Great Northern Railroad Company, acting by its duly authorized president Galusha A. Grow, and by other duly authorized agents, on or about the 15th day of March, 1872, and on or about the last days of April, 1872, and on or about the first days of May, 1872, and throughout the time from about the 15th day of March, 1872, to the 4th day of May, 1872, promised, agreed, and represented unto and with said Anderson county and the electors thereof that the general offices, machine shops, and roundhouses of the Houston & Great Northern Railroad, upon the completion of said railroad to Palestine, would be established and forever thereafter maintained at Palestine, in Anderson county, Tex.

"That said promises, agreements, and representations were deliberately authorized and made by the Houston & Great Northern Railroad Company, with the intention that the electors of Anderson county should act and rely upon same. That the electors of Anderson county were induced, by said promises, agreements, and representations, to authorize and therefore did authorize by their votes at an election held in said county on the 1st, 2d, 3d, and 4th days of May, 1872,

the issuance and delivery to the Houston & Great Northern Railroad Company of the interest-bearing bonds of Anderson county for the principal sum of $150,000 in denominations of $500, payable in 20 years from their date, with interest at the rate of 8 per cent. per annum from their date, as per coupons to be attached, the interest and 2 per cent. of the principal to be paid on the 1st day of January of each year, said bonds to be issued and delivered upon the completion of said railroad to an intersection with the International Railroad at Palestine, and upon the establishment of a depot within half mile of the courthouse at Palestine, and upon the commencement of the regular running of cars by said company to such depot.

"That said electors would not have authorized the issuance and delivery of said bonds, nor the offer of same to the Houston & Great Northern Railroad Company, but for the inducement of the above-mentioned promises, agreements, and representations, by the company, that it would establish and forever maintain general offices, machine shops, and roundhouses at Palestine, nor but for the fact that the electors relied and acted upon same.

"That the said Judge John H. Reagan made a thorough canvass of Anderson county between about the 15th day of March, 1872, and the 4th day of May, 1872, to induce the electors of Anderson county to vote to authorize the issuance of said bonds in strict conformity with his promise to, and agreement with, the Houston & Great Northern Railroad Company and its president, as hereinbefore alleged.

"That said election was held under and by virtue of a proper order of the commissioner's court of Anderson county, Tex., and subsequently on the 6th day of May, 1872, an order was entered in said court declaring that more than two-thirds of the qualified voters of Anderson county had voted in favor of the issuance of said bonds.

"That prior to the 31st day of December, 1872, the Houston & Great Northern Railroad Company completed its railroad from the north boundary of Houston county to its intersection with the International Railroad at Palestine, and built a depot within one-half mile of the courthouse at Palestine, and commenced to run its cars regularly thereto, and thereafter, on or about the 29th day of January, 1873, said company, by its President, Galusha A. Grow, applied to the commissioner's court of Anderson county for the interest-bearing bonds of said county in the principal sum of $150,000, as hereinbefore described, and as authorized by the electors of said county; and, in order to induce the commissioner's court of Anderson county to issue and deliver said bonds, the said Houston & Great Northern Railroad Company, acting by its duly authorized president, Galusha A. Grow, again prom-

ised, agreed, and represented unto said county and said commissioner's court that the company had already begun to establish and would thereafter forever maintain, its general offices, machine shops, and roundhouses at Palestine; and, acting on said promise, agreement, and representation, and relying on same, as well as on the previous promises, agreements, and representations of said company, as hereinbefore set out, the said commissioner's court was induced to issue and deliver, and on or about the 29th day of January, 1873, did issue and deliver, unto the Houston & Great Northern Railroad Company, the interest-bearing bonds of Anderson county, as theretofore authorized by the electors, bearing date as of December 31, 1872, for the principal sum of $150,000, in denominations of $500 each, payable in 20 years from their date, with interest from their date at the rate of 8 per cent. per annum, as per coupons attached, the interest and 2 per cent. of the principal payable on the 1st day of January of each year, commencing January 1, 1874.

"That, if the president of the Houston & Great Northern Railroad Company and the other agents of said company were not expressly authorized by it to make the contracts, promises, agreements, and representations hereinbefore alleged (as plaintiffs expressly aver they were), yet the said Houston & Great Northern Railroad Company was nevertheless bound thereby; for plaintiffs aver that the said Houston & Great Northern Railroad Company, with full knowledge of the facts hereinbefore pleaded, acquiesced in, approved, and ratified each and all of the aforesaid contracts, promises, agreements and representations of its said president, and of its other agents, with the intention to adopt same and to be bound thereby, and with such knowledge obtained and accepted the services of Judge John H. Reagan, as above shown, and obtained, accepted, and retained the above-mentioned bonds of Anderson county, as well as the proceeds thereof, and this plaintiffs are ready to verify.

"That in September, 1873, the Houston & Great Northern Railroad Company and the International Railroad Company, by unanimous vote of their respective stockholders, united, consolidated, and merged the railroads, properties, rights, franchises, powers, and capital stock of the two companies, under the name of the International & Great Northern Railroad Company, and this consolidation was approved, ratified, and confirmed by the Legislature of the state of Texas, by acts approved respectively on the 24th day of April, 1874 (Sp. Laws 1874, c. 21), and on the 10th day of March, 1875 (Sp. Laws 1875, c. 49).

"That by section 2 of the Act of April 24, 1874, it was expressly provided that all acts

theretofore done in the name of either of said companies should have the same binding force and effect upon the International & Great Northern Railroad Company that they had upon the respective companies. That the Houston & Great Northern Railroad Company, in part performance of the aforesaid contracts, promises, and agreements, promptly established the machine shops and roundhouses of the Houston & Great Northern Railroad at Palestine, Tex., and maintained the same there until the consolidation of the Houston & Great Northern Railroad Company with the International Railroad Company, and thereafter, to the present time, the machine shops and roundhouses of the International & Great Northern Railroad, in further performance of said contracts, promises, and agreements, have been continuously maintained by the International & Great Northern Railroad Company and by the International & Great Northern Railway Company at Palestine, Tex.

"That heretofore, to wit, on or about the first of the year 1875 (plaintiffs being unable after this lapse of time to more definitely fix the date), the International & Great Northern Railroad Company, acting by its duly authorized general manager, H. M. Hoxie, contracted and agreed with the citizens of the city of Palestine, Tex., among whom were the plaintiffs Geo. A. Wright and J. W. Ozment to fully and completely perform the promises, contracts, and agreements of the Houston & Great Northern Railroad Company, with said citizens and with Anderson County, and with the electors of said county, by at once locating the general offices of the International & Great Northern Railroad at Palestine, and by thereafter forever keeping and maintaining the general offices, machine shops, and roundhouses of said International & Great Northern Railroad at Palestine, for and in consideration of the bonds heretofore issued by Anderson county to the Houston & Great Northern Railroad Company, and for the further additional consideration that said citizens should at once construct and complete, at their own cost and expense, any and all houses at Palestine, Tex., which might be demanded by the International & Great Northern Railroad Company, in accordance with such plans or specifications as might be furnished by the company, through its officers, for occupancy, at reasonable rentals, by employés of said company and their families, and especially by general officers of said company, their families, and clerks.

"That the citizens of Palestine, as required by said contract and agreement, did at once, in the early part of the year 1875, construct and complete, at their own cost and expense, amounting to many thousands of dollars, each and all of the houses at Palestine, Tex., which were demanded by the International & Great Northern Railroad Company, numbering more than 20, in accordance with the plans and directions furnished by the company and its officers, for occupancy, at reasonable rentals, by the employés of said company and their families, and especially by general officers of said company, their families, and clerks, to the entire satisfaction of the International & Great Northern Railroad Company, and thereupon the said International & Great Northern Railroad Company became bound by its aforesaid contract and agreement (as well as by the previous contract and agreement of one of its constituents) to forever keep and maintain the general offices, machine shops, and roundhouses of the International & Great Northern Railroad at Palestine.

"That if the general manager of the International & Great Northern Railroad Company, H. M. Hoxie, was not expressly authorized by said company to make the contract and agreement hereinbefore set out, which he did make, in behalf of said company, with the citizens of Palestine (as plaintiffs expressly aver he was), yet the International & Great Northern Railroad Company was nevertheless bound thereby, for plaintiffs aver that said company, with full knowledge of said contract and agreement, acquiesced in, approved, and ratified same, with the intention to adopt it and be bound thereby, and with such knowledge said company accepted the benefits of the expenditures made by the citizens of Palestine in the construction of houses for its employés as above shown, and in performance of its obligations under said contract and agreement the International & Great Northern Railroad Company did immediately, and in the early part of the year 1875, locate and establish the general offices of the International & Great Northern Railroad at Palestine, and did thereafter continuously maintain such general offices at Palestine until the 1st day of September, 1911; and, in compliance with the aforesaid contract and agreement, the International & Great Northern Railroad Company and the International & Great Northern Railway Company have continuously maintained the machine shops and roundhouses of the International & Great Northern Railroad at Palestine from the date of said contract and agreement to the present time.

"That, under the laws of Texas, the International & Great Northern Railroad Company had prior to the 9th day of May, 1911, become the owner of 1,106 miles of railroad, extending from Palestine to Houston, from Longview, via Palestine, to Laredo, and from Spring to Ft. Worth, with several branches, spurs, and terminals, and has also become the owner of trackage rights over 53.5 miles of railroad, including the Galves-

ton, Houston & Henderson Railroad, from Houston to Galveston, together with the franchise to operate said 1,106 miles of railroad and said 53.5 miles of railroad, as a common carrier of freight and passengers for hire, and had become the owner of valuable equipment and other property, connected with said lines of railroad and the operation thereof.

"That said railroads, franchises, equipment and other property were owned and held by the International & Great Northern Railroad Company on said 9th day of May, 1911, subject to the lien of a mortgage, of date November 1, 1879, securing bonds in the principal sum of $11,291,000, and also subject to the lien of a mortgage on specific property securing certain bonds known as 'Colorado river bridge bonds,' in the principal sum of $198,000, and also subject to the lien of a mortgage, on specific property, securing a loan upon the company's San Antonio station in the principal sum of $42,000, and also subject to a lien on certain equipment for the principal sum of $392,650, and also subject to the lien of a mortgage of date March 1, 1892, securing bonds and script in the principal sum of $2,966,052.50, besides interest, and also subject to a valid subsisting judgment and decree of foreclosure of the lien of a mortgage, dated June 15, 1881, for the sum of $12,165,545.60, with 6 per cent. per annum interest from May 10, 1910, said judgment and decree of foreclosure providing that said railroads, franchises, equipment, and the other property of said railroad company should be sold subject to the lien of the mortgage of date November 1, 1879, and also subject to the lien of the mortgage securing said Colorado river bridge bonds, and subject to the lien of the mortgage securing said loan on the San Antonio station, and also subject to the lien on said equipment, but not providing that said railroads, franchises, equipment, and other property should be sold subject to the lien of said mortgage of date March 1, 1892, though the trustee under the mortgage of date March 1, 1892, was a party to said judgment and decree of foreclosure, and though such trustee, and the holders of the bonds secured by said mortgage of date March 1, 1892, were bound by said judgment and foreclosure.

"That on the said 9th day of May, 1911, the owners of substantially all of said $2,966,052.50 of bonds and script, with accrued interest, had acquired or had arranged to acquire substantially all of said judgment of foreclosure of said mortgage of date June 15, 1881, for $12,165,545.60, with 6 per cent. per annum interest from May 10, 1910, or had acquired, or arranged to acquire, the bonds and mortgage on which said judgment was based, and on said date, acting by and through certain agents theretofore appointed and authorized, called a 'Committee of Third Mortgage Bondholders,' and said owners,

among whom were the owners of all outstanding stocks of said International & Great Northern Railroad Company, entered into a certain agreement for the reorganization of the fiscal affairs of the company, upon the following basis in substance, to wit:"

Here follows statement of the agreement under which the sale and purchase of the property and franchises of the International & Great Northern Railroad Company was made. It is then alleged:

"That in consummation of the foregoing reorganization agreement the railroads and other property of the International & Great Northern Railroad Company were sold under said judgment and decree of foreclosure on the 13th day of June, 1911, when one Frank C. Nicodemus, Jr., of New York City, as trustee for the parties to said agreement, acting through said 'Committee of Third Mortgage Bondholders,' bid in said railroads and other property for the sum and price of $12,645,000, and the bid of said trustee was thereafter on June 14, 1911, duly accepted and confirmed by the court.

"That thereafter, on or about the 10th day of August, 1911, Frank C. Nicodemus, Jr., and certain nominal associates, filed in the office of the Secretary of State of the state of Texas a certain charter forming a corporation, under article 4550, of chapter 11, of title 94, of the Revised Civil Statutes of Texas, as amended by the act of the Legislature of Texas approved September 1, 1910 (Acts 31st Leg. c. 4), under the name of the 'International & Great Northern Railway Company,' for the purpose of acquiring, owning, maintaining, and operating the railroads theretofore forming the International & Great Northern Railroad, with an authorized capital stock of $11,500,000, divided into 115,000 shares, of the par value of $100 each, of which 50,000 shares should be preferred stock and 65,000 shares should be common stock, and thereby was created the defendant International & Great Northern Railway Company.

"That subsequent to the filing of said charter, and on or about the 13th day of September, 1911, the said trustee, Frank C. Nicodemus, Jr., complied with his bid of $12,645,000 for said railroads and other property, by surrendering for cancellation, by authority of the parties to said reorganization agreement (who then owned the same), foreclosed bonds of the value of $12,400,746.55, in satisfaction to that extent of said judgment and decree of foreclosure, and by the payment as agent for the parties to said reorganization agreement of $244,253.45 in cash, of which cash $100,000 had been deposited at the date of the bid, and thereupon, by direction of said trustee, and in accordance with an assignment of his bid, and in consummation of said reorganization agreement, and with the approval of the court, decreeing and confirming the sale, the railroads

forming the International & Great Northern Railroad, and all appurtenant property, franchises, and equipment, including $556,987.55 in cash, were conveyed unto said new corporation, the defendant International & Great Northern Railway Company. That the International & Great Northern Railroad Company joined in said conveyance in execution and ratification of said reorganization agreement. * * *

"That since the Houston & Great Northern Railroad Company contracted and agreed to locate, keep, and maintain the general offices, machine shops, and roundhouses of the Houston & Great Northern Railroad at the city of Palestine, for a valuable consideration received, and since the International & Great Northern Railroad Company contracted and agreed to locate, keep, and maintain the general offices, machine shops, and roundhouses of the International & Great Northern Railroad at the city of Palestine, for a valuable consideration, and since the general offices, machine shops, and roundhouses of the Houston & Great Northern Railroad and the International & Great Northern Railroad have been located at the city of Palestine in Anderson county, Tex., which county has aided said Houston & Great Northern Railroad and said International & Great Northern Railroad by an issue of bonds in consideration of such location being made, the laws of Texas, on the 1st day of September, 1911, and continuously afterwards to the present time, imposed, and do now impose, upon the International & Great Northern Railway Company the performance of the public and statutory duty, inuring to plaintiffs' special benefit, to keep and maintain the general offices, machine shops, and roundhouses of the International & Great Northern Railroad at the city of Palestine, in Anderson county, and the state of Texas, by general law, expressly forbade and prohibited, and still forbids and prohibits, any change from the said city in the location of said general offices, machine shops, and roundhouses. That the International & Great Northern Railroad Company, prior to the sale of its railroad and other property, under said reorganization agreement, was not only bound by contract, but was bound by general law, as a part of its duty to the public, coupled with the enjoyment of its corporate franchises, to keep and maintain the general offices, machine shops, and roundhouses of said railroad, at the city of Palestine, and such duty could not be, and was not, impaired, nor discharged by the sale of said railroad with its appurtenant property and franchises in consummation of said reorganization agreement. .

"That the general offices maintained at the city of Palestine for the operation of the International & Great Northern Railroad (whether by the company or by receivers) for years prior to the 1st day of September, 1911, included that of vice president, secretary, treasurer, auditor, general freight agent, general manager, general superintendent, general passenger and ticket agent, chief engineer, superintendent of motive power and machinery, master mechanic, master of transportation, fuel agent, and general claim agent.

"That in willful disregard of its contract obligations unto plaintiffs, and in open and flagrant violation of the laws of the state of Texas, the defendant International & Great Northern Railway Company, on or about the 1st day of September, 1911, undertook to change the location of all its general offices, except that of superintendent of motive power and machinery, and that of master mechanic, from the city of Palestine to the city of Houston, Tex., and undertook to establish the most important general office of its traffic manager without the state of Texas in the city of New Orleans, in the state of Louisiana; and in seeking to accomplish such changes the defendant has caused the vice president and general manager, secretary, treasurer, auditor, general freight agent, general superintendent, general passenger and ticket agent, chief engineer, master of transportation, fuel agent and general claim agent, with their respective subordinates, engaged in the operation of the International & Great Northern Railroad, to remove to the city of Houston, in Harris county, Tex., and to there establish so-called general offices, from which their respective duties are performed, and the defendant has caused the traffic manager for the International & Great Northern Railroad, together with his subordinates, to establish an office at New Orleans, La., from which their duties are performed.

"That defendant has declared the purpose to change from the city of Palestine the location of the general offices of said superintendent of motive power and machinery and of said master mechanic, and to change the location of the machine shops and roundhouses of said railroad, as actually operated, immediately upon the institution of this suit, or of any suit of a like nature; and the defendant will make the aforesaid changes in further violation of law, unless prevented by the immediate issuance and service of the writ of injunction.

"That acting upon the faith and credit of the contracts and agreements hereinbefore plead, and in reliance thereon, the plaintiffs have acquired property rights in the city of Palestine worth many hundreds of thousands of dollars.

"That plaintiffs have been irreparably damaged by the transfer from Palestine of the general officers and their subordinates, numbering some 250 men, with an estimated pay roll of $250,000 annually, such removal having greatly reduced the volume of business

in said city and having materially depreciated all property values therein, and such damage, already amounting to over $100,000, will continue and increase, until the return of said officers and their subordinates to their rightful location.

"That should the defendant cease to maintain and operate said machine shops and roundhouses and the general offices of said superintendent of motive power and machinery and master mechanic at the city of Palestine with their annual pay roll far in excess of that of the removed general offices, as threatened by defendant, such action would destroy or depreciate plaintiffs' property to an amount far in excess of half a million dollars, and would imperil and largely sacrifice the property and business interests of said city, and there would be no way to measure the resulting injury nor to make compensation therefor, and the damages thus sustained would be inestimable and irreparable and this plaintiffs are ready to verify.

"That, while the damages which would be sustained by plaintiffs by the continued absence of defendant's general officers and their subordinates from Palestine during the pendency of this suit would be great and irreparable, the trouble and cost to defendant of restoring such officers, with their subordinates, books, and records, to Palestine, would be so slight and inconsiderable as to be trivial, the transfer from Palestine to Houston having been effected within a few hours, over defendant's own railroad, and by means of defendant's own trains, and the return could be as easily and cheaply accomplished.

"That said general officers were transferred to Houston with actual knowledge and notice upon the part of the defendant that this suit would be promptly brought, and that application would be made for a peremptory injunction to restore the status of said general offices, machine shops, and roundhouses, as they existed when the controversy arose between plaintiffs and defendant as to their location, and as such status had existed for more than 30 years.

"That this petition is presented to the court at the earliest possible moment after plaintiffs became possessed, though exercising the utmost diligence, of actual knowledge as to the facts pertaining to the reorganization of the International & Great Northern Railroad.

"That plaintiffs have no adequate remedy at law for the wrongs and injuries upon them by defendant, nor to prevent the grievous wrongs and injuries which they are threatened by the defendant, and in no other way can plaintiff have any complete or adequate remedy for the wrongs and injuries already suffered by them, nor to prevent those with which they are threatened, save through the intervention of your honor and of the court with the writ of injunction.

"That the exercise by your honor of the power to apply the equitable remedy of injunction, without notice, while essential to prevent irretrievable loss and injury to plaintiffs, cannot, under the facts herein pleaded, work damage or injury to the defendant.

"That Hon. B. H. Gardner, judge of the Third judicial district of Texas, and judge of the district court of Anderson county, Tex., is one of the citizens of the city of Palestine in whose behalf this suit is brought, and is the owner of property in said city, and he is also the father of the wife of the plaintiff R. C. Sewell, and hence said judge is disqualified to hear and to act upon plaintiffs' application for injunction, or to make any order herein.

"Wherefore plaintiffs pray the honorable judge of the district court, to whom this petition is presented, for a writ of injunction, commanding the defendant to desist and refrain from changing the location of the machine shops and roundhouses of the International & Great Northern Railroad as operated by defendant from the city of Palestine, and to desist and refrain from changing the location of the general offices of the superintendent of motive power and machinery and of the master mechanic, engaged in the operation of said railroad from the city of Palestine, and to desist and refrain from keeping or maintaining any other general offices in connection with the operation of said railroad at any other place than the city of Palestine, and commanding the defendant to keep and maintain all of the general offices, for the operation of said railroad, at the city of Palestine, allowing the defendant such time as your honor may deem reasonable for the return to the city of Palestine of defendant's general officers, now in the cities of Houston, Tex., and New Orleans, La., with their subordinates, books, and records.

"And plaintiffs pray that the defendant may be cited as required by law, to answer this petition, that the court will hear proof, and that plaintiffs may have judgment, establishing the contracts and agreements herein pleaded, and decreeing that the defendant specifically perform such contracts and agreements by forever keeping and maintaining at the city of Palestine the general offices, machine shops, and roundhouses of the International & Great Northern Railroad, and for judgment enforcing the public duty of defendant to forever keep and maintain its general offices, machine shops, and roundhouses at the city of Palestine, and that plaintiffs may have judgment that the injunction above applied for be made perpetual, and for all other and further relief, special and general, in law and in equity, to which plaintiff may be rightly and justly entitled."

The allegations of the petition are supported by the following affidavits:

"The State of Texas, County of Anderson. I, Geo. A. Wright, do solemnly swear that I am one of the plaintiffs in the foregoing petition, and that the matters of fact therein alleged are true, and that I make this affidavit in behalf of, and as agent for, coplaintiffs in said petition and myself. [Signed] Geo. A. Wright. Subscribed and sworn to before me by Geo. A. Wright, this the 6th day of February, 1912. J. B. McDonald, Notary Public for Anderson County,, Texas."

"The State of Texas, County of Anderson. I, Mrs. Mollie Ford Reagan, do solemnly swear that I am the widow of Judge John H. Reagan, formerly of Anderson county, Texas; that I was present at the home of myself and Judge John H. Reagan, then my husband, on or about the 15th day of March, 1872, when Galusha A. Grow, acting in behalf of the Houston & Great Northern Railroad Company, offered to extend the line of the Houston & Great Northern Railroad to Palestine, and I know, of my own personal knowledge, that, as a consideration for the bond issue desired from Anderson county, by said company, in aid of the construction of said railroad, the company, through President Grow, offered unto the citizens of the city of Palestine, then represented by Judge Reagan, to locate and establish, and to thereafter forever maintain, the general offices, machine shops, and roundhouses of the Houston & Great Northern Railroad at the city of Palestine; that the plaintiff Geo. A. Wright was present when said offer was made; that I believe all of the averments of the foregoing petition to be true; and that this affidavit is made in behalf of the plaintiffs in said petition. Mrs. Mollie Ford Reagan. Subscribed and sworn to before me, by Mrs. Mollie Ford Reagan, on this the 6th day of February, 1912. J. B. McDonald, Notary Public for Anderson county, Texas. [Seal.]"

"The State of Texas, County of Anderson. I, J. W. Ozment, do swear that I am one of the plaintiffs in the foregoing petition; that I was a party to the contract and agreement between the citizens of Palestine, and the International & Great Northern Railroad Company, on or about the first of the year 1875, and that the averments of said petition, relative to said contract and agreement and relative to compliance therewith by the citizens of Palestine, to the satisfaction of said Company, are true; and I make this affidavit in behalf of, and as agent for, my coplaintiffs in said petition and for myself. J. W. Ozment. Subscribed and sworn to before me, by J. W. Ozment, on this the 6th day of February, 1912. J. B. McDonald, Notary Public for Anderson County, Texas. [Seal.]"

Upon presentation of this petition and affidavits to Hon. James I. Perkins, judge of the Second judicial district, without notice to appellant or opportunity given it to be heard, the judge made and entered the following order, from which this appeal is prosecuted. "The State of Texas, County of Cherokee. In Chambers, at Rusk, Texas. The foregoing petition for injunction having been presented to me on this the 7th day of February, 1912, and having been carefully considered, it is ordered that the clerk of the district court of Anderson county, Texas, do issue a writ of injunction commanding the defendant International & Great Northern Railway Company to desist and refrain from changing the location of the machine shops and roundhouses of the International & Great Northern Railroad, as operated by the defendant, from the city of Palestine, and to desist and refrain from changing the location of the general offices of the superintendent of motive power and machinery and the master mechanic engaged in the operation of said railroad from the city of Palestine, and to desist and refrain from keeping and maintaining the general offices of the vice president and general manager, secretary, treasurer, auditor, general freight agent, traffic manager, general superintendent, general passenger and ticket agent, chief engineer, master of transportation, fuel agent, and general claim agent, engaged in the operation of the International & Great Northern Railroad, at any other place than the city of Palestine, and commanding the defendant to keep and maintain the general offices above named for the operation of the said railroad, with their general officers, subordinates, and records at the city of Palestine, provided that the defendant shall be allowed 60 days from this date within which to return to said city of Palestine such of its general officers as are now in the cities of Houston, Tex., and New Orleans, La., with their subordinates, books, and records, said writ of injunction to issue upon the petitioners executing to the defendant a bond with two or more good and sufficient sureties, in the sum of $5,000, conditioned as required by law. Witness my official signature in the town of Rusk, Texas, on this the 7th day of February, 1912. James I. Perkins, Judge of the Second Judicial District of Texas."

Appellant's first assignment of error is as follows: "The judge erred in taking jurisdiction and in making his fiat in this case without notice and hearing, and upon mere inspection of the petition and the affidavits, and in taking jurisdiction on the ground that jurisdiction and venue was in the district court of Anderson county, Tex., and in directing the clerk of that court to issue the writ of injunction, it not being shown from the petition that the venue and jurisdiction were in the district court of Anderson county, Tex., but it appearing and being shown in the petition, as well as to be inferred therefrom, that the jurisdiction of this case was not in Anderson county, Tex.,

and was in Harris county, Tex., and if not shown to be in Harris county, Tex., then in the county where the defendant was domiciled under its charter and wherever it had its principal office, and the judge erred in making his fiat and taking jurisdiction."

[1] If the suit be regarded as a suit for injunction, the venue of the suit under article 2996 is in the county of defendant's domicile. This article provides that writs for injunction for causes other than to stay proceedings in a suit or execution on a judgment shall be returnable to and tried in the proper court of the county in which the defendant has his domicile, unless there is more than one party against whom the writ is issued, in which case it may be returned and tried in the county of the domicile of either defendant. This article, taken in connection with the preceding article of the statute (2995), which directs that upon the granting of any writ of injunction the party to whom the same is granted shall file his petition therefor, together with the order of the judge granting the same, with the clerk of the proper court, clearly shows that it was the purpose of the Legislature in enacting said articles to fix the venue of suits for injunction for causes other than to stay proceedings in a suit or execution upon a judgment, in the county of the domicile of the defendant, or one of the defendants if the writ is granted against more than one party.

[2] Subdivision 27 of article 1194 of the Revised Statutes provides: "Whenever in any law authorizing or regulating any particular character of action the venue is expressly prescribed, the suit shall be commenced in the county to which the jurisdiction may be so given." The meaning of this latter article is perfectly plain. Notwithstanding the general venue statute fixes the venue of suits against a railroad corporation in any county through or into which the railroad of such corporation extends or is operated, if the suit against such corporation is one for injunction, it can only be brought in the county in which the corporation has its domicile. This is the construction given this provision of the statute in the case of Ft. Worth & D. C. Ry. Co. v. Jenkins, 29 S. W. 1113, in which a writ of error was denied by our Supreme Court. In that case the Court of Appeals for the Second district held that the provision of the statute fixing the venue of suits for land in the county in which the land is situated controlled the general provision that suits against a railroad could be brought in any county through or into which the railroad extended, and that a suit against a railroad for the recovery of land must be brought in the county in which the land is situated.

[3] So far from alleging that the domicile of the appellant is in Anderson county, we think it fairly inferable from the allegations of the petition that appellant's domicile as fixed by its charter is not in the county of Anderson, but in the county of Harris. The petition alleges that the general offices of the defendant are now in Houston, Harris county, and, while it alleges that it is "required by law to keep and maintain its general offices at the city of Palestine in the county of Anderson," this legal duty is based not upon any allegation that the defendant's charter fixes its general offices at Palestine, but upon allegations of a contract made many years ago with a railroad company, the property and franchises of which are now owned by the appellant company, which contract it is alleged is binding on the appellant. Conceding that these allegations are sufficient to show that the appellant is under a binding contract by which it is required by law to keep and maintain its general offices in the city of Palestine, this suit having been brought for the purpose of determining this very question, the appellant could not by these allegations be deprived of its right to have that question tried in the county of its present domicile.

[4] Another established rule of venue of suits is that, where two causes of action are properly joined in one suit, such suit may be brought in the county in which a suit upon either of the causes of action might be commenced. Middlebrook v. Manufacturing Co., 86 Tex. 706, 26 S. W. 935.

[5] It is also the law that, where the injunction applied for is merely ancillary to the main purpose of the suit, the suit cannot be regarded as a suit for injunction in the purview of article 2996, before mentioned, fixing the venue of suits for injunctions.

[6] Appellees contend that the allegations of the petition show that this is a suit for specific performance of a contract, the venue of which is fixed by the statute in any county through or into which the appellant operates its railroad, or in which it has an agent or representative, and that the injunction feature is merely ancillary to the main purpose of the suit. We have had much difficulty in reaching a conclusion upon the questions raised by these contentions. The writer is strongly inclined to the opinion that the suit cannot properly be regarded as one for specific performance, but that the primary and ultimate purpose of the suit, as disclosed by the petition, is to obtain a perpetual injunction requiring the appellant to forever maintain its machine shops, roundhouses, and general offices in the city of Palestine, and the contract alleged is only alleged and sought to be established as the basis of the right to injunction, and the suit is therefore one for injunction in the purview of the statute before mentioned. Being in some doubt upon this question, I have concluded it proper to resolve that doubt in favor of the judgment and agree with my associate in holding that the suit is one for specific performance, injunction

being ancillary to the main purpose of the suit, and therefore can be brought in Anderson county. This holding requires the overruling of appellant's first assignment of error.

We shall not consider the various remaining assignments of error presented in appellant's brief in detail, but will content ourselves with a statement and decision of the questions which we deem material to a proper disposition of this appeal.

[7] We do not think the objection that the alleged contracts were void because at the time of their execution such contracts were against public policy is tenable. At the time the contracts were made the statute in force in this state (article 4888, Paschal's Digest), in reference to the location of the general offices of a railroad company, provided "that such corporation shall, as soon as convenient after its organization, establish a principal office at some point on the line of its road and may change the same at pleasure, giving public notice in some newspaper of such establishment and change." While this law recognized the right of a railroad company to change the location of its general offices to suit its convenience, such recognition cannot be regarded as a legislative limitation of the right of a railroad to make a contract for the permanent location of such offices.

In the case of the City of Tyler v. St. Louis & Southwestern Ry. Co., 87 S. W. 243, this court held that a contract of this kind was not void because against public policy, but that such contract could not be enforced by injunction. In that case the Supreme Court not only affirmed the holding of this court that the contract was not void as against public policy, but held that the performance of such contract could be enforced by injunction. City of Tyler v. St. Louis & S. W. Ry. Co., 99 Tex. 494, 91 S. W. 1. It would, we think, be a forced construction of the statute before quoted to hold that it evidences a legislative expression of public policy which would forbid a railroad company to contract for the permanent location of its general offices. In the absence of such legislative expression of public policy, the authorities sustain the proposition that contracts of this kind should not be held void per se on the ground that they are against public policy. The case of People v. C. & A. Ry. Co., 130 Ill. 175, 22 N. E. 857, and other cases cited by appellant to sustain its contention that such contracts are against public policy and therefore void, are cases involving the permanent location of depots. In the case of Ry. Co. v. Robards, 60 Tex. 545, 48 Am. Rep. 268, our Supreme Court refuses to follow the line of cases holding that a contract for the permanent location of a depot is void, and in discussing the question uses the following language: "It is not perceived how it could work injury to the public for a company to bind itself by contract to per-manently maintain a station at any point on the road, provided it includes no prohibition against establishing such other stations as the management might deem necessary and convenient. * * * The fact that such contracts might work an inconvenience to the company would afford no reason for holding them to be against public policy. It is the public that must be injuriously affected, to have that effect upon contracts. These corporations are created with power to contract, and experience has not yet determined any necessity for the courts to assume a sort of guardianship over them, so as to protect them against their improvident contracts. On the contrary, it is generally understood that they are able to deal in close quarters with natural persons in this particular."

It is urged by appellant that this expression of our Supreme Court is directly in support of the contention that a contract for the permanent location of the general or principal office of a railroad is against public policy, because a contract to perpetually maintain the general offices of a railroad company at a designated place is to all intents and purposes an agreement by the railroad not to establish such offices at any other place. That this is the effect of such a contract is unquestionably true, for the reason that a railroad company could not have two general offices when that term is used to designate the place of business of all of its general officers, or at least there could be no necessity for having two such offices. It is equally true that the public interests would not suffer by the road's having its principal office confined to one locality as it would by a restriction on the right of the road to establish as many depots along its line as the public necessity or convenience may require.

Our opinion being that the alleged contracts were not void at the time they were executed, it is not necessary for us to determine whether the act of 1889, which expressly recognizes the right of a railroad company to make such contracts, would give validity to a contract executed prior to said act and which was against public policy at the time it was executed. The rule seems to be well established that the act could not have such effect, but, the contracts being valid at the time they were executed, the rule has no application.

[8] A number of other objections are presented questioning the sufficiency of the petition in regard to the contracts between the Houston & Great Northern Railroad Company and the county of Anderson and the supplemental contract between citizens of Palestine and the International & Great Northern Railroad Company to locate and maintain the machine shops, roundhouses, and general offices of said railroad companies at the city of Palestine. Some of the

objections made to these allegations may be valid, considered as special exceptions to the petition, but we think there are allegations sufficient to show that the agreements were made as alleged and that for the considerations alleged said railroad companies bound themselves to keep and maintain their machine shops, roundhouses, and general offices in the city of Palestine. City of Tyler v. St. Louis & Southwestern Ry. Co., 99 Tex. 494, 91 S. W. 1.

[9] The most serious question presented by appellant is the contention that the defendant, the International & Great Northern Railway Company, cannot be held bound by any contract of the International & Great Northern Railroad Company to keep and maintain its machine shops, roundhouses, and general offices at the city of Palestine. The allegations of the petition show that the International & Great Northern Railroad Company, which by consolidation with the Houston & Great Northern Railroad Company absorbed all the property, rights, and franchises of the latter company and also became bound by all of its obligations, was sold out under foreclosure proceedings, and that the defendant company, which was organized under article 4550 of the statutes of this state, acquired from the purchaser at said foreclosure sale all of the property, rights, and franchises of said sold-out company. The petition contains allegations as to the agreements under which the foreclosure sale was made and the property purchased by a trustee for certain bondholders of the foreclosed company and by him transferred to the defendant company, which was organized by said trustee and certain "nominal associates." There are also allegations showing that the securities issued by the new company were turned over to the holders of the bonds for satisfaction of which the foreclosure was had. We suppose the purpose of these allegations was to show that the new company is but a reorganization or rejuvenation of the sold-out company, and that such reorganization did not in reality effect any change in the sold-out company except in its name, and therefore the new company is bound by the obligations of the sold-out company. We think these allegations fail to show any illegality or irregularity in the foreclosure proceedings or in the organization of the new company.

[10] If there was any irregularity in the organization of the new company, the validity of its charter cannot be questioned by appellant in this suit, and its legal existence as a bona fide corporation organized under the article of the statute before cited can only be questioned by the state. Such being the status of the defendant company, it took the property of the sold-out company subject only to the liabilities and obligations imposed upon it by the statute under which it was organized. Article 4550, before cited, reads as follows: "In case of any such sale heretofore or hereafter made of the roadbed, track, franchise or chartered right of a railway company or any part thereof as mentioned in article 4549, the purchaser or purchasers thereof and their associates shall be entitled to form a corporation under chapter 1 of this title, for the purpose of acquiring, owning, maintaining and operating the portion of the road so purchased as if such road or portion of the road were the road intended to be constructed by the corporation, and when such charter has been filed the said new corporation shall have all the powers and privileges conferred by the laws of this state upon chartered railroads, including the power to construct and extend; provided, that notwithstanding such incorporation the portion of the road so purchased shall be subject to the same liabilities, claims and demands in the hands of the new corporation as in the hands of the purchaser or purchasers of the sold-out corporation; provided, that by such purchase and organization no rights shall be acquired under any former charter or law in conflict with the provisions of the present Constitution in any respect, nor shall the main track of any railroad once constructed and operated be abandoned or removed." We see from this statute that a corporation organized thereunder for the purpose of acquiring and operating a railroad which has been sold under execution, order of sale or deed of trust, takes title to the sold-out road subject to the same liabilities, claims, and demands that it was subject to in the hands of the original purchaser at the sale under execution, order of sale, or deed of trust, and it therefore becomes necessary for us to determine what obligations of the sold-out company followed the road in the hands of such purchaser.

[11] It is well settled that in the absence of any statute affecting the liability of the purchaser of a railroad sold under judicial proceeding or under deed of trust that a purchaser who acquires the property and franchises of such railroad company takes the property free from all liability for its former indebtedness not secured by a lien, and free from all mere personal obligations of the former company. In the case of Railway Co. v. Newell, 73 Tex. 334, 11 S. W. 342, 15 Am. St. Rep. 788, the Supreme Court of this state announced this rule, and holds that a contract with a railroad for the establishment and permanent maintenance of a depot is a personal obligation of the railroad company which does not follow the road in the hands of one who purchased it at execution sale, and cannot be enforced against such purchaser. In the case of Williams v. Railway Co., 22 Tex. Civ. App. 278, 55 S. W. 130, it was held by the Court of Civil Appeals for the Second district that a company organized under article 4550 of the statute, before quoted, was not bound by a contract made with the sold-out company

to build and maintain a depot at a designated place. The holding in these cases as to the extent of the liability of a purchaser upon the contracts of a sold-out railroad finds general support in the authorities from this and other states, among which are the following cases: Railway Co. v. Morris, 67 Tex. 692, 4 S. W. 156; Railway Co. v. Harle, 101 Tex. 170, 105 S. W. 1107; Hukle v. Railway Co., 71 Kan. 251, 80 Pac. 603, 6 Ann. Cas. 83; Menasha v. Railway Co., 52 Wis. 414, 9 N. W. 396. In the case of Hoard v. Railway Co., 123 U. S. 222, 8 Sup. Ct. 74, 31 L. Ed. 130, the Supreme Court of the United States, in discussing the liability of a purchaser of a railroad sold under a mortgage foreclosure, says: "The persons who purchased the railroad at the mortgage foreclosure sale did not thereby, under any statute of the state, or any contract of which we are aware, become obligated to pay the debts and perform the obligations of the railroad company. They bought the property of that company and its franchises; but if, as such purchasers, they thereby became bound to pay all the debts and perform all the obligations of the corporations, whose property they bought, it would put an end to purchases of railroads."

[12] Under these authorities it is clear that but for the legislative act of 1889, which is now article 4367 of the Revised Statutes, the appellant would not be bound by the obligation of the former company to keep and maintain its machine shops, roundhouses, and general offices at the city of Palestine. Article 4367 of the statutes is as follows: "Every railroad company chartered by this state, or owning or operating any line of railway within this state, shall keep and maintain permanently its general offices within the state of Texas at the place named in its charter for the locating of its general offices; and if no certain place is named in its charter where its general offices shall be located and maintained, then said railroad company shall keep and maintain its general offices at such place within this state where it shall have contracted or agreed or shall hereafter contract or agree to locate its general offices for a valuable consideration; and if said railroad company has not contracted or agreed for a valuable consideration to maintain its general offices at any certain place within this state, then such general offices shall be located and maintained at such place on its line in this state as said railroad company may designate to be on its line of railway. And such railroads shall keep and maintain their machine shops and roundhouses, or either, at such place or places as they may have contracted to keep them for a valuable consideration received; and if said general offices and shops and roundhouses, or either, are located on the line of a railroad in a county which has aided said railroad by an issue of bonds in consideration of such loca-

tion being made, then said location shall not be changed; and this shall apply as well to a railroad that may have been consolidated with another as to those which have maintained their original organization." We think under this statute the contract for the maintenance of the machine shops, roundhouses, and general offices of the International & Great Northern Railway Company at Palestine cannot be regarded as a mere personal obligation of that company, but was an obligation or duty imposed by law which followed the road into the hands of the purchaser and may not be disregarded by the appellant company, which holds the road and property of the old company subject to the same liability that attached to it in the hands of the purchaser at the foreclosure sale. If no company had been organized under article 4550, and the purchaser at said sale had continued the operation of the road under the franchises and charter rights which passed to him by such purchase along with all the property of the road, we think it clear that he could not have escaped the obligation imposed upon him by the statute above quoted to maintain the machine shops, roundhouses, and general offices of the road at Palestine, and by the terms of the statute under which the appellant company was chartered its liability for the obligations of the former road is the same as that of the purchaser at the foreclosure sale.

Article 4367 of the statute, above quoted, is not permissive but mandatory. It does not grant a privilege, but imposes a duty. It required no legislative sanction to validate a contract made by a railroad company to maintain its machine shops, roundhouses, and general offices at a designated place on its line of road, and the clearly expressed purpose of the Legislature in the passage of this act was to impose upon any railroad that had prior thereto or might subsequently contract for a valuable consideration received to keep and maintain its machine shops, roundhouses, and general offices at a designated location, the duty of permanently maintaining same at such location and to forbid the road from changing such location. We hardly think the Legislature could have used language more expressive of its intent to perpetuate the maintenance of the machine shops, roundhouses, and general offices at the place at which the railroad had contracted for a valuable consideration to locate and maintain them, and the purpose and effect of this statute is to make such location as fixed and unchangeable as that of the roadbed. This was the effect of the holding of this court in the Tyler Case, supra, as to that portion of the statute referring to counties in which bonds had been issued in aid of a railroad. Without directly passing upon this question, the Supreme Court held in the case mentioned that the obligation of a railroad to maintain its shops and offices at the place it had contracted to

locate them was the same whether the consideration for such contract was the issue of bonds by a county or some other valuable consideration. It follows from this construction of the statute that the trial judge did not err in holding that the appellant was bound by the alleged contracts of its predecessors in title.

[13] Appellant further complains of the order appealed from on the ground that the allegations of the petition show no sufficient emergency to justify the issuance of an injunction without notice to the defendant and opportunity being given it to be heard. We think this is a valid objection to the mandatory portion of the order requiring appellant within 60 days from the date of the order to remove its general offices from their present location to the city of Palestine. The power of a court of equity to grant a preliminary injunction without notice to the defendant should never be exercised unless there is pressing necessity for such action, and as a general rule a mandatory injunction should not be ordered before a final hearing of the case and for the purpose of executing the judgment of the court. The usual purpose of a preliminary injunction is to maintain the status quo of the subject-matter of the suit, or to prevent impending injury, and when the issuance of such injunction would have the effect of granting all the relief that could be obtained by a final decree it should not be granted, except in cases of extreme hardship. The instinct of justice which forbids that one should be condemned without a hearing permeates our whole system of jurisprudence and while cases may and do occur in which the danger of irreparable injury is so great and so pressing that the restraining hand of equity should be immediately interposed to prevent such injury, the present case cannot be placed in that category. In the case of Holbein v. De La Garza, 126 S. W. 42, Mr. Justice Reese, speaking for this court, says: "It is rarely, under our equity procedure in regard to the issuance of injunctions, that it becomes necessary to issue a temporary writ of injunction, even a merely prohibitory writ, without a hearing. If it appears necessary from the allegations of the petition that a defendant be stopped at once and without the delay necessary to give notice and an opportunity to be heard, a temporary restraining order may in all cases be issued compelling immediate cessation of the threatened injury until such time as may reasonably be required to allow the defendant to present his side of the case, which may change the whole aspect of the controversy. If it be said, in answer, that a defendant may obviate this difficulty by a motion to dissolve, wherein he may fully present his objections to the issuance of the writ, the reply is apt and conclusive that under the peculiar rule adopted by the Legislature allowing appeals from an order granting a temporary injunction, but not to an order refusing to vacate on motion to dissolve, a defendant would ordinarily lose, by lapse of time, his right to appeal from the order granting an injunction if he delayed until his motion to dissolve could be heard. It is, we think, a serious omission in the law on this subject that no appeal is given from an order overruling a motion to dissolve. This court had occasion to express its views upon this defect in the statute in the Chaison Case [56 Tex. Civ. App. 611] 121 S. W. 717." The rule which should control the issuance of mandatory preliminary injunctions from their nature should be more stringent than that followed in the issuance of injunctions that are merely prohibitory. In Joyce on Injunctions it is said that an applicant for a preliminary mandatory injunction should show a clear right and a case of necessity or extreme hardship, and that "a court will seldom grant a mandatory injunction pendente lite unless the plaintiff's right is so clear that a denial of the right must be either captious or unconscionable." Joyce on Inj. § 97a. The same author says that, when the effect of such injunction is to anticipate the judgment and give the relief which is sought to be obtained by a final decree, it should be granted "with great caution and only when the necessity is great."

[14] It cannot be said that the allegations of the petition in this case, which we have before set out, show such pressing necessity as to justify the exercise of this extraordinary power of the court. The general offices of the appellant company were moved from the city of Palestine more than five months before this suit was filed. The only damage alleged to have been caused plaintiffs by such removal results from decrease in the value of their property and in the general volume of business in the city of Palestine. This damage could not have been materially increased by the short delay which would have been caused by giving the defendant an opportunity to be heard, and we think it was a clear abuse of the power of the court to grant the mandatory portion of the injunction without notice. We are further of opinion that no sufficient emergency is shown to authorize the granting of an injunction of this kind before final hearing.

It follows from these conclusions that the order of the judge granting the injunction should be reformed by omitting that portion which commands the defendant to remove its general offices to the city of Palestine and as so reformed the order should be affirmed, and it is so adjudged.

Reformed and affirmed.