CITY OF PALESTINE, TEXAS, et al., Petitioners,

v.

UNITED STATES of America, Interstate Commerce Commission and Missouri Pacific Railroad Company, Respondents.

William M. GIBBONS, Trustee of Chicago, Rock Island and Pacific Railroad Company, Debtor, Petitioner,

v.

The UNITED STATES of America and the Interstate Commerce Commission, Respondents.

Nos. 76–2689 and 76–3507.

United States Court of Appeals, Fifth Circuit.

Sept. 19, 1977.

John O. Davis, City Atty., William R. Green, County Atty., Palestine, Tex., James D. Smullen, Houston, Tex., for petitioners.

William J. Hickey, Edward J. Hickey, Jr., Washington, D. C., for Railway Employes' Dept., AFL–CIO.

Donald C. McDevitt, Rock Island Railroad, Chicago, Ill., for William M. Gibbons.

Griffen B. Bell, U. S. Atty. Gen., U. S. Dept. of Justice, Washington, D. C., William R. McDowell, Dallas, Tex., for intervenor-appellee-Missouri Pacific Railroad Co. et al.

Hanford O'Hara, Assoc. Gen. Counsel, Charles H. White, Jr., Assoc. ICC Gen. Counsel, Mark L. Evans, Gen. Counsel, Washington, D. C., Lloyd John Osborn, Atty., Donald I. Baker, Asst. Atty. Gen., App. Section, Dept. of Justice, Washington, D. C., for respondents.

J. Barnwell Phelps, New Orleans, La., Mark M. Hennelly, St. Louis, Mo., for Missouri Pacific Railroad Co.

Before COLEMAN, Circuit Judge, KUNZIG, Judge,* and GEE, Circuit Judge.

GEE, Circuit Judge:

We are called upon to review certain collateral aspects of an Interstate Commerce Commission (ICC) order granting authority to merge under section 5(2) of the Interstate Commerce Act, 49 U.S.C. § 5(2), to Missouri Pacific Railroad Company (MoPac) and its principal subsidiaries, the Texas and Pacific Railway Co. (T&P) and Chicago & Eastern Illinois Railroad Co. (C&EI). The merger was unopposed, but two controversies surrounding the petition for merger concern us here. The first involves an agreement between MoPac and the City of Palestine, Texas, to maintain a specified number of employees at Palestine. The second involves the intervention by the Trustees of the bankrupt Chicago, Rock Island and Pacific Railroad Company (Rock Island), who requested indemnity for alleged traffic losses due to the merger or, alternatively, for inclusion in the merger. The ICC relieved MoPac of its agreement with Palestine and denied Rock Island's request for indemnity or inclusion. We reverse the ICC's first action, but affirm the second.

## I. City of Palestine.

An understanding of the MoPac-Palestine conflict requires a review of the history of the 1954 Palestine agreement. On March 15, 1872, Galusha Grow, President of the Houston & Great Northern Railroad Company (H&GN), entered into an agreement with Judge John H. Reagan to extend H&GN's railroad line to Palestine, to establish a depot within one-half mile of the courthouse, and to commence running cars regularly to Palestine by July 1, 1873. H&GN also agreed to locate and establish and forever thereafter keep and maintain the general offices, machine shops and roundhouses of H&GN in the City of Palestine. In consideration of these promises from H&GN, Judge Reagan agreed to induce the electorate of Anderson County, in which Palestine is located, to issue interest-bearing bonds on the credit of the county in the sum of $150,000 and to deliver those bonds to H&GN. The voters of Anderson County approved the bonds, and H&GN fulfilled its part of the agreement.

International Railroad Company (IRC) also possessed a railroad line to Palestine running from Hearne, Texas. In September of 1873, the stockholders of IRC and H&GN agreed to a merger of the two companies into one corporation. The International & Great Northern Railroad Co. (I&GN). This merger was approved in 1874 by the Texas Legislature as required by state law at that time. The legislative approval expressly provided that all acts done in the name of either of the companies should have the same binding force and effect upon the merged company. In 1875, then, I&GN agreed to establish its offices, machine shops and roundhouses at Palestine. The consideration for this agreement was again the $150,000 in interest-bearing bonds given to H&GN plus an agreement by the citizens of Palestine to construct, at their own cost and expense, housing for the officers and employees of the company.

Thereafter, I&GN fell upon hard times. In 1911, after a number of financial machinations—none of which are relevant here—, I&GN faced foreclosures of mortgages on all of its corporate holdings. Certain creditors undertook a reorganization of I&GN by the creation of a new corporation that

---

* Judge of the United States Court of Claims, sitting by designation.

would succeed to all of the rights and liabilities purchased by the creditors at the foreclosure sale. This new company was also called International & Great Northern Railroad. Its corporate charter filed with the Secretary of State of the State of Texas provided that the offices of the new company would be in Houston, Texas.

Anderson County and the City of Palestine responded to the indicated change of corporate headquarters with a suit for an injunction to enforce the 1872 agreement. A spirited legal battle followed involving two Texas courts of civil appeals, see *International & Great Northern Railway Co. v. Anderson County*, 174 S.W. 305 (Tex.Civ. App.—Texarkana 1915, writ ref'd); *International & Great Northern Railway Co. v. Anderson County*, 150 S.W. 239 (Tex.Civ. App.—Galveston 1912, writ granted); the Texas Supreme Court, see *International & Great Northern Railway Co. v. Anderson County*, 106 Tex. 60, 156 S.W. 499 (1913); and the United States Supreme Court, see *International & Great Northern Railway Co. v. Anderson County*, 246 U.S. 424, 38 S.Ct. 370, 62 L.Ed. 807 (1918).[1]

I&GN's primary argument against the injunction action was that it was a new corporation not bound by the contractual obligation of the old company. The Texas cases construing these facts clearly indicate that I&GN was correct if the only obligation to maintain its offices, shops and roundhouses in Palestine derived from the 1872 contract. The contract alone was a personal obligation that would not have bound the new company. *See International & Great Northern Railway Co. v. Anderson County*, 150 S.W. 239, 251 (Tex.Civ.App.— Galveston 1912, writ granted); *International & Great Northern Railway Co. v. Ander-*

*son County*, 106 Tex. 60, 156 S.W. 499, 502 (1913). Nevertheless, each court found the new company impressed with the obligation of maintaining its offices, shops and roundhouses in Palestine because of a Texas statute. That statute provided, in pertinent part, that a railroad company chartered by the state without charter-designated office location

> shall keep and maintain its general offices at such place within this state where it shall have contracted or agreed, or shall hereafter contract or agree, to locate its general office for a valuable consideration. . . . And such railroads shall keep and maintain their machine shops and roundhouses, or either, at such place or places as they may have contracted to keep them for a valuable consideration received; and, if said general offices and shops and roundhouses, or either, are located on the line of a railroad in a county which has aided said railroad by an issue of bonds in consideration of such location being made, then said location shall not be changed; and this shall apply as well to a railroad that may have been consolidated with another as to those which have maintained their original organization.

Tex.Rev.Civ.Stat.Ann. art. 6423 (1911) [now found in Tex.Rev.Civ.Stat.Ann. arts. 6275, 6277 (1926)]. Because the previous company had contractually agreed to maintain its offices, shops and roundhouses at Palestine, the statute had the effect of making this agreement a continuing obligation on the part of the new company. *See International & Great Northern Railway Co. v. Anderson County*, 106 Tex. 60, 156 S.W. 499, 503–05 (1913). The United States Supreme Court refused to overturn the state court's

---

1. The trial court granted a preliminary injunction preventing I&GN from moving its headquarters from Palestine. This was appealed to the Court of Civil Appeals, see *International & G. N. Ry. Co. v. Anderson County*, 150 S.W. 239 (Tex.Civ.App.—Galveston 1912, writ granted), and the Texas Supreme Court, see *International & G. N. Ry. Co. v. Anderson County*, 106 Tex. 60, 156 S.W. 499 (1913). Although the question in the above cases primarily concerned venue, the courts addressed themselves to the merits by upholding the injunction. After final judgment on a jury verdict in favor of Anderson County and Palestine, the railroad appealed again and lost in the Court of Civil Appeals, see *International & G. N. Ry. Co. v. Anderson County*, 174 S.W. 305 (Tex.Civ.App. —Texarkana 1915, writ ref'd), and the United States Supreme Court, see *International & G. N. Ry. Co. v. Anderson County*, 246 U.S. 424, 38 S.Ct. 370, 62 L.Ed. 807 (1917).

interpretation of the effect of the statute and also ruled the statute constitutional. *See International & Great Northern Railway Co. v. Anderson County*, 246 U.S. 424, 432–34, 38 S.Ct. 370, 62 L.Ed. 807 (1918). Thus, the 1914 judicial decree of the District Court of Cherokee County forever bound I&GN to maintain its general offices, machine shops and roundhouses in Palestine.

Subsequent to this decree, I&GN was acquired by Missouri Pacific (MoPac). Unfortunately, MoPac suffered bankruptcy shortly thereafter, and on March 31, 1933, MoPac and its subsidiaries filed petitions in bankruptcy requesting approval of a proposed plan of reorganization under section 77 of the Bankruptcy Act. The proposed plan of reorganization filed with the ICC provided for a consolidation of the subsidiaries of MoPac, including I&GN, into a united company. The 1914 decree proved an impediment to this consolidation. Subsection (n) of section 77 of the Bankruptcy Act protected the 1914 judicial decree from the power of the bankruptcy court:

> No reorganization effected under this title and no order of the court or Commission in connection therewith shall relieve any carrier from the obligation of any final judgment of any Federal or State court rendered prior to January 1, 1929, against such carrier or against one of its predecessors in title, requiring the maintenance of offices, shops, and roundhouses at any place, where such judgment was rendered on account of the making of a valid contract or contracts by such carrier or one of its predecessors in title.

11 U.S.C. § 205(n) (1970). In light of this proscription, the bankruptcy court held out the possibility that I&GN could be operated as a separate company but preferred that MoPac secure a modification of the 1914 decree so that the planned unification could be complete.

Thus, in 1954, MoPac entered into negotiations with the City of Palestine and Anderson County to secure a modification of the 1914 decree and the 1872 contract. On December 21, 1954, the parties executed the "Palestine Agreement" in which MoPac agreed to forever maintain in Palestine 4.5% of all of its employees in certain job classifications. In consideration of this agreement, the City of Palestine and Anderson County agreed to a modification of the 1914 decree to reflect MoPac's new agreement and waived any cause of action against MoPac for noncompliance with the 1914 judgment. On March 2, 1955, the District Court of Cherokee County, Texas, entered a judgment modifying the 1914 decree in accordance with the 1954 Palestine Agreement. The Agreement had the effect of releasing I&GN from its obligations to maintain its general offices, shops and roundhouses in Palestine, and MoPac and I&GN were consolidated.

This case arises from MoPac's attempt to rid itself of the 1954 Palestine Agreement. In connection with its application for ICC approval of a voluntary merger plan designed to unify MoPac with two subsidiaries—Texas & Pacific Railway Co. (T&P) and Chicago & Eastern Illinois Railroad Co. (C&EI)—MoPac asked the ICC to relieve it from the requirements of the 1954 Palestine Agreement. *See* Missouri Pacific Railroad Co.—Merger—The Texas & Pacific Railway Company and Chicago & Eastern Railway Company, 348 I.C.C. 414 (1976). The ICC ruled that it had the power to abrogate the 1954 Palestine Agreement and that, in light of the agreement's unduly burdensome effect on MoPac and on interstate commerce, it would exercise its power to abrogate the agreement. 348 I.C.C. at 430.

The City of Palestine, joined by intervenor Railway Employes' Department, AFL–CIO, appeals that part of the ICC's order abolishing the 1954 Palestine Agreement. Palestine asserts that the ICC lacked power to void a valid contract between a railroad and a third party and that, even assuming the ICC had such power, the Commission exceeded its authority in abrogating this contract. Respondent MoPac and the ICC understandably argue that the Commission could relieve MoPac from the burdens imposed by the Palestine Agreement and properly exercised its discretion in doing so.

To encourage the realization of its national policy of an integrated, efficient and coordinated system of rail transport, Congress empowered the ICC to approve voluntary mergers and consolidations designed to produce efficient and economical railway service in the public interest. In 49 U.S.C. § 5(2), Congress granted the ICC the power to approve voluntary railroad consolidations, mergers, acquisitions and other transactions provided that the proposed transaction is "consistent with the public interest," "just and reasonable" and properly approved by the stockholders of the affected parties.[2] *Schwabacher v. United States,* 334 U.S. 182, 194, 68 S.Ct. 958, 92 L.Ed. 1305 (1948). In section 5(11), Congress granted the ICC exclusive and plenary power to effectuate the transactions approved under the power vested in the Commission in section 5(2). An approved transaction goes into effect without the need for state approval and free of any "restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable [the carriers] to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission . . . ." 49 U.S.C. § 5(11) (1970).[3] Both parties look to an interpretation of section 5(11) to determine the ICC's power to abrogate the Palestine Agreement.

Palestine and MoPac battle mightily over two questions that our disposition of the case renders unnecessary for our decision. The first is the respondents' claim that the 1954 Palestine Agreement is not a true contract but instead derives its power from the Texas statutes requiring railroad companies to continue maintaining their offices, shops and roundhouses in their previously established locations. *See* Tex.Rev.Civ. Stat.Ann. art. 6275–80 (1926). In *Texas v. United States,* 292 U.S. 522, 54 S.Ct. 819, 78 L.Ed. 1402 (1934), the Supreme Court ruled that the ICC had the authority to relieve interstate carriers from the effects of the Texas statutes as a concomitant to its power to approve a lease of one railroad by another. Finding that the consolidation of operations in one office outside the state would avoid waste and thus promote the public interest in economy and efficiency of rail transportation, the Court ruled that the ICC's attempt to secure these advantages was well within the congressional purpose of the statute and thus within the ICC's ability. Section 5(11) confirmed that the ICC may pursue the public interest unfettered by state law. Pointing to *Texas v. United States,* the respondents argue here that the 1954 agreement was intimately related to Texas law. Without the 1954 agreement, respondents claim, MoPac would have remained bound by the 1914 judicial decree. Had MoPac failed to perform the 1954 Palestine Agreement, the 1914 decree could be reinstated. Respondents urge that these incidents to the 1954 agreement render it indistinguishable from the state statutes that led to its birth and thus subject to the ICC power recognized in *Texas v. United States.* Palestine asserts that the contract was a separate agreement supported by valid consideration.

The second claim is respondents' contention that even if the Palestine Agreement is viewed only as a contract the ICC has the

---

2.     (a) It shall be lawful, with the approval and authorization of the Commission, as provided in subdivision (b) of this paragraph—

(i) For two or more carriers to consolidate or merge their properties or franchises, or any part thereof, into one corporation for the ownership, management, and operation of the properties theretofore in separate ownership; . . . .

(b) . . . If the Commission finds that, subject to such terms and conditions and such modifications as it shall find to be just and reasonable, the proposed transaction is within the scope of subdivision (a) of this paragraph and will be consistent with the public interest, it shall enter an order approving and authorizing such transaction, upon the terms and conditions, and with the modifications, so found to be just and reasonable . . . .

49 U.S.C. § 5(2) (1970).

3. In 1976, Congress amended certain provisions of the Transportation Act, leading to a redesignation of former § 5(11) as § 5(12). *See* 49 U.S.C.A. § 5(12) (Supp.1977). For convenience, we will continue to refer to the present § 5(12) as § 5(11).

power under section 5(11) to abrogate it. Palestine rejoins that Congress did not intend to give the ICC this power.

■ We need not resolve either of these questions because, assuming for the purpose of argument that the ICC has the power to abrogate this contract, we conclude that the ICC's power only extends to setting aside state restraints to the effectuation of an approved section 5(2) transaction and no further. Although the Palestine Agreement may burden MoPac, the agreement clearly is not an obstacle to the merger of T&P and C&EI and does not threaten the merger's success. The ICC exceeds the scope of its authority when it voids contracts that are not germane to the success of the approved section 5(2) transaction.

■ In its grant of approval authority, Congress did not issue the ICC a hunting license for state laws and contracts that limit a railroad's efficiency unless those laws or contracts interfered with carrying out an approved merger. *See Schwabacher v. United States, supra,* 334 U.S. at 207, 68 S.Ct. 958 (Frankfurter, J., dissenting). *Cf. Texas & New Orleans Railroad Co. v. Brotherhood of Railroad Trainmen,* 307 F.2d 151, 158–60 (5th Cir. 1962) (ICC exceeded authority when dictated labor contract as part of approval of yard agreement between railroads). Section 5(11)'s description of the freedom enjoyed by carriers in an approved merger recognizes that the carriers' immunity from state law extends only *"insofar as may be necessary to enable them to carry into effect* the transaction so approved or provided for . . . ." 49 U.S.C. § 5(11) (1970) (emphasis supplied). These words express a practical limitation on the power of the ICC. The ICC's pursuit of the public interest focuses on its approval of railroad mergers, consolidations, acquisitions, and other section 5(2) transactions. Actions taken by the ICC in connection with those transactions but not necessary to them exceed the scope of its authority. In section 5(11) Congress clearly expresses a sensitivity to state law: the ICC's approval may overturn state law only where "necessary to carry into effect" the transaction.

The ICC has shown little sensitivity in this case.

The Palestine Agreement has no role in the ICC's analysis of the proposed voluntary merger of MoPac, T&P and C&EI. The merger, although increasing the number of "MoPac" employees, will not require an increase in the number of personnel in Palestine: the Agreement provides for a downward adjustment of the percentage of people employed in Palestine in the case of merger. The merger is merely a "corporate simplification" designed to bring two near-wholly owned subsidiaries under the banner of the parent company—the three companies have operated as one system for several years. The Administrative Law Judge and the ICC concluded that the Palestine Agreement was a burden on MoPac and interstate commerce, but there is no indication that this burden presents any obstacle to the merger. Despite the irrelevance of the Palestine Agreement to the merger, the ICC has gratuitously relieved MoPac of its contractual obligations. We cannot countenance this action.

■ Precedent in the Supreme Court suggests that the ICC may shoulder aside state restraints in its approval of mergers only when such action is necessary to the effectuation of the merger. In *Texas v. United States, supra,* the Texas statutes on offices, shops and roundhouses, Tex.Rev. Civ.Stat.Ann. art. 6275–80 (1926), threatened to prevent one railroad's lease of another by requiring that the lessor forego consolidation with the offices of the lessee as the price of leasing a Texas-based railroad. In *Seaboard Airline Railroad Co. v. Daniel,* 333 U.S. 118, 68 S.Ct. 426, 92 L.Ed. 580 (1948), South Carolina constitutional provisions forbidding non-South Carolina chartered railroads from operating in the state would have negated an ICC-approved acquisition of a South Carolina railroad's lines by another railroad. In *Schwabacher v. United States, supra,* the insistence on further compensation by preferred stockholders of a merging company exceeded the compensation found just and reasonable in the ICC's approved plan of merger. In

each of these cases the voided state-related provision impinged upon the effectuation of the section 5(2) transaction. In describing the ICC's power under section 5(11), the court has characterized it as "the power of the Interstate Commerce Commission, *in the exercise of its statutory obligations,* to override state laws *imposing obstacles* in the path of otherwise lawful plans of reorganization." *Callaway v. Benton,* 336 U.S. 132, 140–41, 69 S.Ct. 435, 441, 93 L.Ed. 553 (1949). In all of the cases approving the ICC's nullification of state law, the laws stood in the way of the approved transaction.

Our evaluation of the ICC's power might differ if Congress had granted the Commission direct authority to nullify any contract presenting a burden on interstate commerce, but we find no congressional award of such power to the ICC independent of its power of approval of section 5(2) transactions. From this statutory scheme we deduce that Congress intended to empower the ICC to set aside state law restraints only insofar as necessary to assure the effectuation of approved transactions. Here the Palestine Agreement does not affect the "corporate simplification" merger—in fact, the united system of MoPac, T&P and C&EI has already operated successfully for some time under the Agreement. No doubt the merged MoPac system would operate more efficiently and free of "burdens on interstate commerce" without the strictures of the Palestine Agreement, just as it would operate more efficiently and free of "burdens on interstate commerce" if it were relieved of its contractual obligation to pay its debts or a bargained-for wage scale. Congress allowed the ICC significant power to effectuate approved transactions, but it did not authorize gratuitous destruction of contractual relations—even when it serves the general public interest—when the destruction is irrelevant to the success of approved transactions.

4. Six other railroads intervened in the proceedings: Missouri-Kansas-Texas, Illinois Central

## II. *Chicago, Rock Island and Pacific Railroad Co. (Rock Island).*

Rock Island is a not-very-successful competitor of MoPac in the midwest and southwest. The Administrative Law Judge succinctly described the nature of Rock Island's business and its status with regard to the merger applicants:

Rock Island lines comprise approximately 7,000 miles of railroad in the States of Illinois, Iowa, Kansas, Missouri, Nebraska, Minnesota, Colorado, Arkansas, Tennessee, Oklahoma, Texas, New Mexico and Louisiana. Rock Island maintains through routes and joint rates with the applicants, interchanges traffic with them, and is competitive with them on substantial volumes of traffic moving from, to, and within the territory it serves. Rock Island interchanges with the applicants at numerous points, among them: with the MoPac at St. Louis, Fort Worth, Houston, Kansas City, Little Rock, Memphis, Topeka, and Wichita; with the C&FI at Chicago and St. Louis; and with the T&P at Dallas, Fort Worth and Alexandria.

Just a month before the ALJ's hearing on the MoPac merger on April 15–16, 1975, Rock Island voluntarily filed a petition for reorganization under section 77 of the Bankruptcy Act, 11 U.S.C. § 205, in federal district court in Illinois. Unlike the other intervenors in the MoPac merger,[4] the trustee of Rock Island was not satisfied with the protective traffic conditions prescribed in Detroit, T. & I.R. Co. Control, 275 I.C.C. 455 (1950), imposed upon the merging parties by the ICC and sought indemnity for diversion of traffic from Rock Island by the new line.

Rock Island made no substantive presentation at the April hearings in support of its claim for indemnity, but on May 15, 1975, it filed a verified statement and exhibits in support of its estimates of traffic diversion due to the merger. On July 9–10, 1975, the ALJ held a hearing at which Rock Island adduced its evidence and was subjected to cross-examination by the applicants.

Gulf, St. Louis-San Francisco, St. Louis-Southwestern, Santa Fe, and Southern.

Rock Island also sought inclusion in the merger. On May 20, 1975, Rock Island asked the ICC to allow the trustee time to decide whether to seek inclusion in the merger. On September 23, 1975, the district judge overseeing Rock Island's reorganization authorized a petition for inclusion in the MoPac merger that was filed with the ICC on September 25, 1975. The next day the ALJ handed down his initial decision denying Rock Island's request for indemnity or inclusion. Rock Island sought to reopen the hearings to show why inclusion of Rock Island in the merger would be in the public interest. The ICC denied the attempt to reopen the proceedings and affirmed the ALJ's initial decision. Rock Island appealed to the Seventh Circuit, and that circuit transferred Rock Island's appeal to our circuit for consideration with the pending matter of MoPac and the City of Palestine. We affirm the ICC's order.

Rock Island based its request for indemnification on documentary evidence and testimony that the proposed merger would produce wide-scale diversion. Based on studies of 1974 traffic, Rock Island claimed that some 7,047 carloads would be diverted from Rock Island by the MoPac. The initial decision of the ALJ best explains Rock Island's methodology in producing this figure:

Rock Island conducted a traffic study in order to determine a projected effect the merger of the applicants would have upon its present traffic level. Revenue settlements for 1974 on interline shipments with each of the applicants provided the basis for a computer printout used in the traffic diversion analysis. These settlement reports indicated that the interchanged cars totaled 43,541 with the revenue portion of Rock Island amounting to $15,113,608.

The computer printout contained the following information for each traffic movement: origin State and station; destination State and station; commodity code number and description; originating and terminating junction and connecting railroad; number of trailers; number of cars; shipment weight; miles; and Rock Island revenue. There were 685 pages in the printout with 9,523 line items. Many single car movements were shown; however, when all of the routing factors designated on the report were the same, multiple movements were shown on one line.

Rock Island established the following guidelines for marking traffic movements on the computer printout for diversion to the proposed new merged system: (1) all traffic originating or terminating at Chicago and originating and terminating at MoPac and T&P destinations will be lost 100 percent; (2) all traffic interchanged by Rock Island at Chicago with Eastern carriers and originated and terminated on MoPac or T&P will be lost 100 percent; (3) traffic originating on MoPac or T&P in the southwest and terminating at Rock Island stations, Des Moines and east, including lines north and south of Des Moines, to Iowa-Missouri border, and presently received in interchange at various junctions (Kansas City, Ft. Worth, etc) will move over the merged system to Chicago, thence Rock Island; (4) traffic originated by Rock Island at points east of the Mississippi River and interchanged with MoPac or T&P at various junctions for termination on MoPac or T&P will move via Chicago; (5) westbound transcontinental traffic currently received from MoPac and delivered to Southern Pacific at Santa Rosa, New Mexico, will be lost to MoPac-El Paso-Southern Pacific route; (6) eastbound transcontinental traffic to the southeast and southwest destinations now received from Southern Pacific at Santa Rosa (Tucumcari gateway) and delivered to MoPac will be lost to Southern Pacific-El Paso-MoPac; (7) Louisiana and Texas shipments originated by MoPac and T&P and now interchanged to Rock Island at Ft. Worth for delivery to connections at Kansas City will move over the merged system to those Kansas City connections; and (8) similar traffic destined to MoPac common points with Rock Island in Kansas, Missouri and Nebraska (Lincoln and Omaha)

will move MoPac direct. In addition to the guidelines, instructions were issued not to record for diversion any traffic movement that physically would be unaffected by the merger.

Rock Island's selection of the first four guidelines was based on the following considerations: (1) the proposed merger will result in longer single-line MoPac routes, which would give the merged system a greater ability to outmuscle Rock Island on competitive traffic; (2) MoPac can afford a larger solicitation budget than Rock Island; (3) MoPac has a larger supply of equipment than Rock Island and the mix is greater; and (4) MoPac has a long-haul routing policy. The last four guidelines were established because Rock Island believes that the new MoPac will emerge with so much clout that Rock Island will be short-hauled on all the traffic identified therein.

Rock Island's traffic expert and an associate reviewed all traffic movements shown on the computer printout to determine if the newly merged system would have the power to divert traffic handled by the Rock Island in 1974. Shipments that could be completely diverted were noted. Alternative routes, including changed interchange points, were posted for short-hauls or partial diversions. As pages of the computer listing were completed they were given to the Assistant Manager-Pricing (Divisions Section) for entry of divisions percents in connection with short-haul notations as a predicate for calculation of revenue losses for partial diversions.

On the basis of the traffic diversion study, Rock Island concluded that 7,047 interline carloads, which yielded $2,614,-997 in gross freight revenues in 1974, would be lost within one year after the merger. Subsequent to cross-examination of its traffic witness and the applicants' rebuttal evidence, Rock Island conceded that the estimated revenue loss was overstated by at least $83,394. Therefore, this amount was deducted from the original $2,614,997 estimate loss leaving a potential annual revenue loss of $2,531,-603 based upon 1974 rate charges. Rock Island contends that 1974 revenues must be updated to reflect the general rate increases that have occurred since. Making allowance for holddowns and flagouts, Rock Island asserts that its revenue loss which was based on 1974 should be increased by 19 percent in order to bring revenue up to rate levels that will be in effect the last quarter of 1975. Thus, the carrier estimates that it would suffer an annual loss of gross revenue approaching $3 million.

Missouri Pacific Railroad Co.—Merger— The Texas and Pacific Railway Company and Chicago & Eastern Illinois Railroad Company, I.C.C. Finance Docket No. 27773 (Sept. 18, 1975).

The ALJ, with the later support of the ICC, chose not to credit Rock Island's traffic study. He did so because he found the study failed to take into account significant facts needed to determine accurately the likelihood of diversion of the 7,047 cars claimed. He also discounted the considerations underlying the first four guidelines used to establish divertible traffic on the grounds that no significant difference existed between a single-system route and a single-line route; that evidence indicated that the merger would not increase. MoPac's solicitation budget because the traffic departments of the three lines are already integrated; that MoPac's long-haul routing policy—common in the industry—had no significant impact on Rock Island[5]; and

---

**5.** The long-haul routing policy is a device to increase the revenue of the delivering railroad. When a shipper designates two railroads to haul a shipment, the first must transfer the cargo to the second in the process of delivery. If, however, the shipper has not designated a junction at which the transfer takes place, the first railroad may deliver to the second at any common point within the tariff schedules. Given several common points at which transfer can take place, the first railroad will deliver at the junction that provides it the longest haul.

The MoPac merger has special significance for Rock Island that further ameliorates any diversion. The merger provides Rock Island with a greater number of MoPac common

that equipment differences between MoPac and Rock Island were not significant because MoPac had larger system needs and because a comparison of the equipment mix between the parties yielded no important differences. In short, the ALJ found Rock Island's traffic study questionable—certainly not sufficient to support indemnification because of diversion. After examining the record the ICC also concluded that Rock Island's traffic study was not compelling.

■ After our examination of the record, we believe the ICC had substantial evidence warranting its rejection of Rock Island's traffic study. Although its evidence represented a paper showing of *potential* diversion, Rock Island presented no evidence conclusively indicating that diversion *would* take place. More important, Rock Island made no convincing showing why a diversion would occur under the new MoPac system which had not occurred under the old family of parent MoPac and subsidiaries T&P and C&EI. The financial incentives for diversion were the same, but Rock Island gave no significant explanation of how a name change and consolidation of an existing unitary system could cause greater harm than separate entities.[6] In fact, the ICC noted that all of the diversions claimed by Rock Island were possible under the present MoPac-T&P-C&EI system and that normal solicitation efforts by the applicants

had not produced diversion in the past. After reviewing the record and the ICC's decision, we conclude that substantial evidence supported the ICC's denial of Rock Island's claim for indemnity.

In support of its petition for inclusion,[7] Rock Island advanced several factors: its evidence of diversion from its lines by MoPac; the elimination of duplicative routes and facilities; and ICC approval of inclusion of other lines in voluntary mergers. The ICC agreed with the ALJ, as do we, that Rock Island did not present adequate evidence of actual diversion. Thus, diversion evidence did not support Rock Island's claim for inclusion.

■ Deprived of its major reason for inclusion, Rock Island asserts that the ICC abused its discretion by rejecting Rock Island's evidence that inclusion would streamline facilities, eliminate duplication of routes, and make for efficient rail transport in the public interest and that inclusion was warranted in light of previous inclusions in other voluntary railroad combinations. In reviewing ICC actions for abuse of discretion under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), we must grant due deference to the agency's decisions, reversing them only if we conclude that the agency lacked a rational basis for its action. *See Ethyl Corp. v. Environmental Protection Agency*, 176 U.S.App.D.C. 373, 541 F.2d

points, giving it an opportunity for longer hauls. Studies by MoPac, cited by the ALJ, indicated that Rock Island's long-haul potential was far greater than MoPac's after the merger.

6. At oral argument counsel for Rock Island suggested that shipping clerks, in designating connecting carriers, tried to minimize typing by selecting a small number of carriers or selecting carriers with few letters. The MoPac merger might give MoPac some benefit by eliminating T&P or C&EI as connections, thus foreclosing Rock Island's substitution because of its fewer letters (RI). Without evidence that this consequence in fact does significantly affect routing, we cannot overturn the ICC's determination.

7. Rock Island complains that the ICC failed to provide adequate review of its petition for inclusion because the ICC characterized its petition as adding "no new information or contentions to the record, other than those which

were adequately discussed and dismissed by the Administrative Law Judge," 348 I.C.C. at 424, when Rock Island had had its petition for inclusion on file only one day before the ALJ's initial decision. Rock Island claims that the ICC relied on the ALJ's actions to reject the petition for inclusion when the ALJ had taken no significant action.

Were this the case we would be concerned, but it is clear that the ICC adequately examined and considered Rock Island's petition for inclusion. The petition was on file with the ICC for over seven months before the ICC issued its report on the MoPac merger. Much of the Rock Island petition for inclusion depended on the diversion evidence adduced in support of its petition for indemnity. The ALJ's rejection of the diversion evidence also reflected adversely on the inclusion claim, and in that sense the ICC could rely on the ALJ's findings.

1, 34, *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976). We find no abuse of discretion here.

The ICC concluded that Rock Island had not demonstrated that the inclusion of Rock Island in the MoPac merger was in the public interest. In doing so the ICC implicitly rejected Rock Island's claims that inclusion would promote the public interest in efficient service by concluding that it was in the public interest for the MoPac merger to go through as originally planned.[8] The merger itself would not harm Rock Island. Further, the inclusion would so severely burden the merged system that the merger—already determined to be in the public interest—might not go through. The ICC could have chosen to include Rock Island, but we cannot say that its decision not to do so lacks rationality. This is especially true where the proposed merger is a mere corporate simplification with little or no real apparent impact on the party seeking inclusion.

On occasion the ICC has either ordered or held open for five years the possibility of inclusion of other railroads in connection with voluntary mergers. *See, e. g., Illinois Central Gulf Railroad Co.—Acquisition— Gulf, Mobile & Ohio Railroad Co., Illinois Central Railroad Co., et al.,* 338 I.C.C. 805 (1971); *Pennsylvania Railroad Co.—Merger —New York Central Railroad Co.,* 327 I.C.C. 475 (1966) (inclusion ordered); *Seaboard Airline Railroad Co.—Merger—Atlantic Coastline,* 320 I.C.C. 122 (1963). From those cases Rock Island argues that it should be included in the MoPac merger. These cases do not suggest an abuse of ICC discretion because they arose in different circumstances. In those cases the ICC considered inclusion because the proposed mergers involved major realignments that could adversely affect other railroads or, in *Pennsylvania,* because inclusion posed an insignificant additional burden to a much larger system. Further, each merger involved anticipated savings in the millions that could ameliorate any inclusion that might occur. Here the ICC considers a corporate simplification—not a major realignment; the merger would not significantly affect Rock Island's operation. Inclusion of the financially straitened Rock Island may have been seen as a significant burden on the merged system, and the savings to be effected under the merger as not to justify the burden. The major distinguishing factor is, of course, that in the previous cases the ICC determined inclusion or receptivity to an inclusion petition to be in the public interest, and here it did not. In light of these differences, those cases do not suggest an abuse of the ICC's discretion in denying Rock Island's petition for inclusion.

## III.  *Summary.*

We have concluded that the ICC exceeded its authority to effectuate approved section 5(2) transactions when it abrogated the Palestine Agreement. We find the ICC's disposition of Rock Island's petitions for indemnity or inclusion supported by substantial evidence and not an abuse of its discretion. Except with regard to the ICC's

---

**8.** The ICC's report does not clearly state whether its decision rested on its refusal to credit Rock Island's claims of efficiency or on a decision that, notwithstanding potential efficiency, the public interest was best served by approval of the merger as originally contemplated. Citing recent enactments evidencing congressional purpose to promote railroad revitalization by restructuring the rail system on a "more economically justified basis," *see* Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. 94–210, 90 Stat. 31, Rock Island urges that the ICC's cavalier dismissal of the efficiency claims supporting inclusion cannot be justified. At the very least, Rock Island asserts, the curtness of the ICC's rejection violates the Administrative Procedure Act, 5 U.S.C. § 557(c), which requires a statement of "findings and conclusions, and the reasons or basis therefor, on all material issues of fact, law, or discretion presented on the record . . . ." 5 U.S.C. § 557(c)(3)(A).

None of Rock Island's contentions have merit. The ICC's failure to enlarge upon its rejection of Rock Island's efficiency claims stemmed from its well-explained determination that regardless of potential efficiency the public interest was better served by approval of the MoPac merger as originally contemplated.

action on the Palestine Agreement, we AF-
FIRM.