# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
July 22, 2022

Lyle W. Cayce
Clerk

No. 21-40445

Union Pacific Railroad Company,

*Plaintiff—Appellee*,

*versus*

City of Palestine, Texas; County of Anderson, Texas,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 6:19-cv-574

Before Higginbotham, Dennis, and Graves, *Circuit Judges*.
James E. Graves, Jr. *Circuit Judge*:

Union Pacific Railroad Company ("Union Pacific") seeks to end its operations in Palestine, Texas, but has been unable to do so because a 1954 Agreement between its predecessor and Defendants City of Palestine ("Palestine") and Anderson County, Texas ("Anderson County") has prevented it from leaving. Because the 1954 Agreement is preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), Union Pacific is free to leave. We affirm.

## I.

The background of this case spans 150 years, and we have discussed much of it in prior opinions. We nonetheless recount it here to illuminate the intersection between the parties' purported contractual agreements and increased federal regulation of the railroad system.

### A.  The 1872 Original Agreement

In the 1870s, during the boom of westward railroad expansion, small towns bid for railroad depots and stops as essential parts of their continued economic power and survival. One of these towns was Palestine, Texas. Palestine was uniquely positioned to serve as the crossroads between the International Railroad, approaching Palestine from Hearne, Texas to the southwest, and the Houston and Great Northern Railroad Company ("HGNR"), approaching Palestine from Houston to the south. *See City of Palestine v. United States*, 559 F.2d 408, 410 (5th Cir. 1977). In 1872, Palestine and Anderson County orally agreed to raise $150,000 in bonds from their citizens to finance the railroad. *Id.* In turn, HGNR agreed to "run[] cars regularly" to Palestine, construct a depot, and "locate and establish and forever thereafter keep and maintain" its "general offices, machine shops and roundhouses" in Palestine. *Id.*

In 1873, HGNR merged with the International Railroad to create the International & Great Northern Railroad ("IGNR"). *Id.* The Texas legislature approved the merger so long as IGNR assumed "all acts done in the name of either of the companies," including HGNR's obligations in the 1872 Agreement with Palestine. *Id.* Consideration included another $150,000 in bonds and Palestine's commitment to construct housing for the IGNR employees. *Id.*

2

### B. The 1892 and 1911 Foreclosure Sales and the 1914 Judgment Granting Injunctive Relief

In 1892, IGNR's assets were sold at a foreclosure sale, but because the purchasers were trustees for IGNR's stockholders, Texas courts ultimately classified this as a mortgage refinancing rather than a bona fide sale. *Int'l & Great N. Ry. Co. v. Anderson Cnty* ("*IGNR IV*"), 246 U.S. 424, 433 (1918). Thus, the 1872 Agreement remained in effect. *Int'l & Great N. Ry. Co. v. Anderson Cnty* ("*IGNR III*"), 174 S.W. 305, 316 (Tex. Civ. App. 1915), *aff'd*, 246 U.S. 424 (1918).

In 1911, IGNR again sold its assets at a foreclosure sale, this time to outside investors who kept the name of the company and listed Houston as the new corporate office. *City of Palestine*, 559 F.2d at 410-11. However, because IGNR planned to move its offices, Palestine and Anderson County successfully sued for an injunction under the 1872 Agreement to keep IGNR's "general offices, machine shops, and roundhouses" in Palestine "forever." *IGNR III*, 174 S.W. at 327. This 1914 Judgment was twice upheld by both the Texas Court of Civil Appeals and the Supreme Court. *See id.; see also, IGNR IV*, 246 U.S. at 434.

In addressing the impact of the foreclosure, Texas courts concluded that there was no "irregularity in the foreclosure proceedings or in the organization of the new company" that would impute the personal obligations of the prior company onto the purchaser. *Int'l & Great N. Ry. Co. v. Anderson Cnty* ("*IGNR I*"), 150 S.W. 239, 250 (Tex. Civ. App. 1912), *aff'd, Int'l & Great N. Ry. Co. v. Anderson Cnty* ("*IGNR II*"), 156 S.W. 499 (Tex. 1913). Instead, the courts used the general rule that "the purchaser of a railroad sold under" foreclosure would take ownership "free from all liability" for indebtedness and similar personal obligations. *IGNR I*, 150 S.W. at 250. The obligation to "maintain its offices, shops and roundhouses in

Palestine" was a "personal obligation that would not have bound the new company." *City of Palestine*, 559 F.2d at 411; *see also IGNR I*, 150 S.W. at 250 (noting that the purchaser in a railroad foreclosure obtains property "free from all mere personal obligations of the former company," including a contract "for the establishment and permanent maintenance of a depot").

Even though personal contractual obligations typically do not transfer to the purchaser in a foreclosure sale, Texas state courts nonetheless concluded that the Texas Office Shops Act changed this calculus, and the purchaser was thus "liable to perform the public duties imposed by law upon the old corporation." *IGNR II*, 156 S.W. at 503 (internal quotations omitted). The Office Shops Act required a railroad such as IGNR to "keep and maintain its general offices at such place within this state where it shall have contracted or agreed" and "said location shall not be changed" even during consolidation if the railroad was "aided . . . by an issue of bonds in consideration of such location." *City of Palestine*, 559 F.2d at 411 (quoting TEX. REV. CIV. STAT. art. 6423 (1911)).

In short, the Texas courts held that the Office Shops Act mandated the transfer of IGNR's personal obligation to remain in Palestine to the new purchaser. *IGNR I*, 150 S.W. at 251 (noting that the requirement was not "a mere personal obligation of that company, but was an obligation or duty imposed by law" that could not be disavowed in a foreclosure sale, even to a bona fide purchaser). The Texas Court of Civil Appeals stated that the 1914 Judgment was "entirely dependent upon the statute, and not the enforcement of a private contract as such, for its vitality." *IGNR III*, 174 S.W. at 316.

IGNR appealed to the Supreme Court, arguing that the Office Shops Act impermissibly burdened interstate commerce and contractual obligations. *IGNR IV*, 246 U.S. at 428. The Supreme Court disagreed and

noted that the new IGNR "took out a charter under general laws that expressly subjected it to the limitations imposed by law." *Id.* at 432.

### C.  The 1954 Agreement and 1955 Judgment Modifying the 1914 Judgment

Later, in the 1920s, Missouri Pacific ("MoPac") purchased IGNR. *City of Palestine*, 559 F.2d at 412. In the 1930s, MoPac filed for bankruptcy and requested reorganization under the Bankruptcy Act. *Id.* As part of its proposed reorganization, MoPac stated it would consolidate with its subsidiaries, including IGNR. *Id.* But because the 1914 Judgment required IGNR to maintain its general offices in Palestine, and MoPac's offices were located elsewhere, this posed a serious problem. *Id.*

The Bankruptcy Act also included the following requirement, which, in essence, required continued enforcement of the 1914 Judgment:

> *No reorganization effected* under this title and no order of the court or Commission in connection therewith *shall relieve any carrier from the obligation of any final judgment of any Federal or State court rendered prior to January 1, 1929*, against such carrier or against one of its predecessors in title, *requiring the maintenance of offices, shops, and roundhouses at any place, where such judgment was rendered* on account of the making of a valid contract or contracts by such carrier or one of its predecessors in title.

*Id.* (citing 11 U.S.C. § 205(n) (1970) (emphasis added)).

Given these difficulties, the bankruptcy court requested that MoPac negotiate with Palestine and Anderson County to modify the 1914 Judgment before it would approve the reorganization. *Id.* As a result of these negotiations, MoPac "agreed to forever maintain in Palestine 4.5% of all of its employees in certain job classifications," but it did not have to "maintain its general offices, shops and roundhouses in Palestine." *Id.* (the "1954

Agreement"). MoPac agreed that as long as it or "any successor in interest or assign thereof shall remain in the railroad business," it would maintain "Office and Shop Employees" in Palestine. A group of ten local citizens (the "Palestine Citizens Committee") signed the 1954 Agreement along with MoPac, Palestine, and Anderson County.

In 1955, the District Court of Cherokee County, Texas, entered a judgment (the "1955 Judgment") that modified the 1914 Judgment to align with the 1954 Agreement's terms, and the bankruptcy court approved the proposed reorganization. *City of Palestine*, 559 F.2d at 412.

## D.  Union Pacific Acquires MoPac and Assumes Operations in Palestine; Texas Repeals the Office Shops Act

Approximately three decades passed, and in 1982, Union Pacific acquired MoPac. Congress passed the Interstate Commerce Commission Termination Act ("ICCTA") which established the Surface Transportation Board ("STB") to regulate rail carriers and preempted various state and local laws that were within the STB's jurisdiction. 49 U.S.C. § 10501(b). In 1997, Union Pacific merged with MoPac. In 2007, Texas repealed its Office Shops Act after determining the ICCTA preempted it. *See* H.R. Rep. 80-3711, Reg. Sess. at 1 (Tex. 2007).

With automatic adjustments from subsequent mergers, Union Pacific must maintain 0.52% of its "Office and Shop" employees in Palestine. Under the 1954 Agreement, these employees can be "Executives, Officials and Staff Assistants; Professional, Clerical, and General; Maintenance of Equipment and Stores; Transportation (other than Train, Engine and Yard); Transportation (Yardmasters, Switch Tenders, and Hostlers)." These employees fall into two categories: (1) "the freight claims department, which investigates and resolves claims arising out of shipments on Union Pacific's rail line," and (2) "the car shop, which repairs cars in Union Pacific's fleet."

No. 21-40445

### E. Procedural History and District Court Orders

In November 2019, Union Pacific filed suit seeking declaratory relief that the ICCTA preempts the 1954 Agreement. Union Pacific also sought an injunction preventing Palestine and Anderson County from enforcing the Agreement. *Id.*

Palestine and Anderson County filed a motion to dismiss and a motion for judgment on the pleadings. The motions were based on the Anti-Injunction Act and the failure to join the Palestine Citizens Committee—the ten local citizens who had signed the 1954 Agreement. The district court denied these motions.

Union Pacific filed a motion for summary judgment, which the district court granted, holding that the 1954 Agreement was expressly and impliedly preempted. It also concluded that the 1954 Agreement did not meet the voluntary contract exception to preemption. The district court enjoined Palestine and Anderson County from enforcing the 1954 Agreement against Union Pacific.

After the district court entered judgment, Palestine and Anderson County filed suit in Texas state court seeking to enforce the 1955 Judgment which had approved the 1954 Agreement. The Texas court has enjoined Union Pacific from reducing its workforce and set the case for trial.

Defendants appeal the district court's grant of summary judgment for Union Pacific and the denials of their motion to dismiss for failure to join a necessary party, motion for judgment on the pleadings, and cross-motion for summary judgment.

### II.

"We review the grant of summary judgment de novo, applying the same legal standards the district court applied to determine whether

summary judgment was appropriate." *See Am. Intern. Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 259-60 (5th Cir. 2003). A summary judgment motion is properly granted only when, viewing the evidence in the light most favorable to the nonmoving party, the record indicates that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "On cross-motions for summary judgment, we review each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party." *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010) (citation omitted). Because the district court granted summary judgment based on federal preemption, both directly and as applied, we must also review this determination. "The preemptive effect of a federal statute is a question of law that we review de novo." *Franks Inv. Co. LLC v. Union Pac. R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010).

"We review de novo a district court's legal determination of the applicability of the Anti-Injunction Act." *See United States v. Billingsley*, 615 F.3d 404, 410 (5th Cir. 2010). And we review de novo a district court's grant of a Rule 12(c) motion for judgment on the pleadings. *See Bosarge v. Miss. Bureau of Narcotics*, 796 F.3d 435, 439 (5th Cir. 2015). "The standard for dismissal under Rule 12(c) is the same as that for dismissal for failure to state a claim under Rule 12(b)(6)." *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir. 2004). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

Lastly, we review "a district court's decision to dismiss for failure to join an indispensable party [under Rule 19] . . . under an abuse-of-discretion standard." *HS Res., Inc. v. Wingate*, 327 F.3d 432, 438 (5th Cir. 2003)

(citation omitted). Similarly, we review a decision to deny a motion to dismiss for failure to join a necessary party under the same standard. *Id.*

## III.

The district court granted summary judgment for Union Pacific after determining that federal law preempts the statutorily mandated contractual agreements between the parties, both expressly and as applied. We agree.

## A.

Any state law that conflicts with either a federal law or the Constitution is "without effect." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). This framework, known as preemption, applies in the railroad context where a state law remedy "invokes laws that have the effect of managing or governing, and not merely incidentally affecting, rail transportation." *Franks,* 593 F.3d at 411 (citation omitted). In determining whether a state law or regulation is preempted, Congress's intent is the "ultimate touchstone." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Congress can indicate its preemptive intent either expressly, through a statute's plain language, or impliedly, through its "structure and purpose." *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008).

In 1995, Congress enacted key legislation known as the ICCTA which abolished the Interstate Commerce Commission and established the Surface Transportation Board to have broad jurisdiction over rail operations. *See* 49 U.S.C. § 10101, *et seq*.

The ICCTA essentially overhauled the railroad industry, which was already historically intertwined with the federal government: "[R]ailroad operations [have] long been a traditionally federal endeavor, to better establish uniformity in such operations and expediency in commerce, and it appears manifest that Congress intended the ICCTA to further that

exclusively federal effort, at least in the economic realm." *Friberg v. Kan. City S. Ry. Co.*, 267 F.3d 439, 443 (5th Cir. 2001). In response to the ICCTA, in 2007, the Texas legislature repealed the Office Shops Acts, concluding it was "preempted by federal law." H.R. 80-3711, Reg. Sess. at 1 (Tex. 2007).

Section 10501(b) of the ICCTA evinces the explicit preemptive intent of Congress, as it describes the STB's exclusive jurisdiction over a wide range of railroad operations:

> (b) The jurisdiction of the Board over—
>
>> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>>
>> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).

The Fifth Circuit has addressed preemption under the ICCTA, holding that section 10501(b) expressly preempts laws that seek to "manag[e] or govern[] rail transportation" and that "[t]o the extent remedies are provided under laws *that have the effect of regulating rail transportation*, they are [expressly] preempted." *Franks*, 593 F.3d at 410 (emphasis in original). However, if a state law or regulation only has a "mere remote or incidental

effect on rail transportation," it is not expressly preempted. *Elam v. Kan. City S. Ry. Co.*, 635 F.3d 796, 805 (5th Cir. 2011) (internal quotations omitted).

Rail "transportation" is broadly defined to include "facilit[ies]" and "services" that are "related to the movement of passengers or property, or both, by rail." 49 U.S.C. § 10102(9). In short, because the 1954 Agreement manages and governs facilities or services related to the movement of passengers or property by rail, it is expressly preempted.

Turning to the specifics: The 1954 Agreement requires Union Pacific to employ a certain percentage of its "Office and Shop Employees" in Palestine. The car shop employees repair empty freight cars, and the freight claims office processes complaints and claims for freight damage. Both categories include employees who are engaged in "services related to" the "movement [of] . . . property" by rail. 49 U.S.C. § 10102(9).

Defendants try to minimize these facts by arguing that Union Pacific's 0.52% employee requirement has "no direct impact on the movement of freight" because the employees work on railcars that are out of service and the shipping claims employees deal with complaints involving items that were previously moved via rail. However, this argument asks us to read language into the ICCTA. There is no requirement for *contemporaneous* movement of property related to the rails for the regulation to be preempted. If the facilities or services—in any non-incidental way—relate to the movement of property by rail, they are preempted by the ICCTA.

Here, the rail car repair shop employees work on cars that were involved in and may later be involved in the movement of items by rail. And the freight claims office employees deal with problems that arose while property traveled via rail. Thus, the 1954 Agreement—which was premised upon now-preempted Texas law and requires the continued employ of these individuals —regulates Union Pacific's use of railroad facilities and services.

Further, the 1954 Agreement's mandate that Union Pacific cannot leave Palestine interferes with the STB's exclusive jurisdiction over "routes, services, and facilities" and the "abandonment, or discontinuance of . . . facilities." 49 U.S.C. § 10501(b). The district court correctly concluded that the 1954 Agreement is expressly preempted.

## B.

In addition to express preemption, Union Pacific argues that the 1954 Agreement is impliedly preempted. This test is more fact-specific than express preemption because we analyze whether state laws "have the effect of unreasonably burdening or interfering with rail transportation." *Franks*, 593 F.3d at 414. As the party asserting preemption, Union Pacific must present "evidence of the specific burdens imposed" and not just "general evidence or assertions" that the state law "somehow affect[s] rail transportation." *Guild v. Kan. City S. Ry. Co.*, 541 F. App'x 362, 368 (5th Cir. 2013). For example, this court concluded that the ICCTA did not impliedly preempt a state action that sought to prevent the closure of four railroad crossings because the evidence presented about potential burdens, including drainage issues, increased maintenance costs, and slower train travel, was not tied to the four specific crossings. *Franks*, 593 F.3d at 415.

For illustration purposes, we note that other courts have held the following actions were preempted because they imposed unreasonable burdens on rail transportation: (1) requiring a railroad to engage in "considerable redesign and construction work"; (2) terminating an easement because it would "stop all use of the tracks" in that specific area; and (3) condemning an "actively used railroad property" because it would impact the railroad's "rights with respect to [a] massive stretch of railroad property." *See, e.g., Union Pac. R.R. Co. v. Taylor Truck Line, Inc.*, No. 15-CV-0074, 2018 WL 1750516, at *7–9 (W.D. La. Apr. 10, 2018); *Wedemeyer v.*

*CSX Transp., Inc.*, No. 2:13-CV-00440-LJM, 2015 WL 6440295, at *5 (S.D. Ind. Oct. 20, 2015), *aff'd*, 850 F.3d 889 (7th Cir. 2017); *Union Pac. R.R. Co. v. Chicago Transit Auth.*, No. 07-CV-229, 2009 WL 448897, at *8–10 (N.D. Ill. Feb. 23, 2009), *aff'd*, 647 F.3d 675 (7th Cir. 2011).

Here, Union Pacific presents many undisputed facts to support its argument that the 1954 Agreement unreasonably burdens and interferes with rail transportation. Palestine and Anderson County do not dispute these facts but rather argue they are not persuasive or appropriate considerations.

Specifically, the 1954 Agreement's mandate to stay in Palestine imposes the following burdens on Union Pacific: (1) Union Pacific no longer has a business need for operations in Palestine, and it can conduct its work more efficiently in other locations; (2) Routing cars to Palestine for repair involves sending them thousands of miles out of the way through congested Houston railyards; and (3) The Palestine facilities are severely outdated and in need of multi-million-dollar improvements in the range of $67 to $93 million.

Our court has stated that economic burdens alone likely do not evince unreasonable interference. *See New Orleans & Gulf Coast Ry. C. v. Barrois*, 533 F.3d 321, 335 (5th Cir. 2008) ("We doubt whether increased operating costs are alone sufficient to establish 'unreasonable' interference with railroad operations."). However, here, the combination of the *economic burden* of spending tens of millions of dollars to renovate an inefficient and expensive facility, designed originally to repair steam locomotives, along with the *logistical burden* of routing cars thousands of miles through an urban bottleneck and providing facilities for the employees who work in Palestine substantially interferes with and burdens Union Pacific's facilities "related to the movement of passengers or property." 49 U.S.C. § 10102(9). We conclude that the 1954 Agreement is impliedly preempted.

## C.

Defendants make one additional preemption attack by asserting that the district court's decision will allow railroads to skirt their contractual obligations. However, Union Pacific does not challenge the validity of *voluntary* contractual agreements, but instead argues that the 1954 Agreement is *involuntary* because its confines were dictated by then-existing state law.

The relevant timeline indicates that the parties' predecessors, HGNR and International Railroad, entered into a voluntary agreement in 1872. *See City of Palestine*, 559 F.2d at 410. However, in the subsequent foreclosure sales, the personal responsibilities of the original contracting parties were transferred to the purchasers as mandated by the Texas Office Shops Act. And, but for this Act, the debtor's "obligation to maintain its offices, shops and roundhouses in Palestine" was a "personal obligation that would not have bound the new company" after foreclosure. *Id.* at 411. Thus, the 1914 Judgment entered after the foreclosure sales contained obligations that were "regulatory in nature, grounded in Texas statutory law, and involuntary" rather than those which result from the "the enforcement of a private contract." *IGNR III*, 174 S.W. at 316.

Then in 1954, when MoPac attempted to reorganize and merge with IGNR in bankruptcy proceedings, the district court refused to allow bankruptcy reorganization unless MoPac assumed IGNR's commitments under the 1914 Judgment to Palestine and Anderson County. *City of Palestine*, 559 F.2d at 412. Otherwise, MoPac would have been unable to proceed with the bankruptcy reorganization because the law at that time mandated that reorganization would not "relieve any carrier from the obligation of any final judgment . . . requiring the maintenance of offices, shops, and roundhouses

at any place, where such judgment was rendered . . . . " *Id.* (citing 11 U.S.C. § 205(n) (1970)).

In other words, MoPac did not voluntarily enter into the 1954 Agreement but was required to assume responsibilities and negotiate within the confines of federal and state laws regarding railroad operations that have since been repealed. Alternatively, MoPac could have (voluntarily) chosen financial ruin. These facts do not support a finding that MoPac voluntarily assumed the conditions of the 1914 Judgment in the 1954 Agreement.

There are further indications that the 1954 Agreement was a mere extension of the Texas Shop Acts. *See, e.g.,* TEX. REV. CIV. STAT. ANN. arts. 6275, 6277 (1926) (regulating the location of Texas-chartered railroads offices, machine shops, and roundhouses like the 1954 Agreement); H.R. Rep. 80-3711, Reg. Sess. at 1 (Tex. 2007) (repealing these laws). Importantly, the 1954 Agreement entitles Palestine and Anderson County to reinstate the 1914 Judgment in the event of a breach. We agree with the district court that this remedy "looks and feels more like the kind of state 'regulation' [or remedy] the ICCTA expressly preempts."

Our sister circuit has provided guidance that we find helpful for determining when a railroad contract is voluntary versus regulatory: "Voluntary agreements between private parties [] are not presumptively regulatory acts" where they are "not the sort of rail regulation contemplated by the statute and . . . do[] not unreasonably interfere with rail transportation." *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 214, 218-19 (4th Cir. 2009) (citation omitted). Here, as discussed above, the 1954 Agreement does unreasonably interfere with rail transportation. *Id.* at 221 (citation omitted).

And given that the Texas Shops Act governs the location of offices, machine shops, and roundhouses—just like the 1954 Agreement—it is the

No. 21-40445

"sort of rail regulation contemplated by the statute." *Id.* at 214. The voluntary contract exception does not apply because Union Pacific was prohibited from using its own "determination and admission." *Id.* at 221 (citation omitted). The 1954 Agreement was not voluntary.

## IV.

Next, Defendants argue that the Anti-Injunction Act bars Union Pacific's case. The district court concluded that because there was no pending state court action, the Anti-Injunction Act did not apply. *See B & A Pipeline Co. v. Dorney*, 904 F.2d 996, 1001 n.15 (5th Cir. 1990) (noting that state court proceeding must be currently "pending" for purposes of the Anti-Injunction Act). While there was no pending state court action when the district court made its ruling, Defendants have since filed one and have received an injunction to prevent Union Pacific from reducing its workforce in Palestine. Regardless, these changed circumstances do not warrant reversal.

According to the Anti-Injunction Act, "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. Union Pacific merely seeks declaratory relief about the validity of the 1954 Agreement and an injunction preventing Defendants from enforcing the 1914 Judgment. It is uncontested that Union Pacific does not seek to enjoin any *pending* state court proceeding.

Further, this court has indicated that the Anti-Injunction Act does not apply where a plaintiff is seeking legal clarity or other legitimate relief instead of attempting to nullify relief to the party who first filed suit. *See Travelers Ins. Co. v. La. Farm Bureau Fed'n, Inc.*, 996 F.2d 774, 776-77 (5th Cir. 1993). Here, Union Pacific filed first and sought declaratory relief to avoid a breach

of contract. In contrast, it is Defendants who sought to block Union Pacific's case by filing a second suit in state court and seeking and obtaining injunctive relief.

And to the extent collateral estoppel[1] could impact future litigation, this is insufficient to trigger the Anti-Injunction Act's prohibitions, particularly since the purpose of the Declaratory Judgment Act—which Union Pacific seeks relief under—is "to provide a means to grant litigants judicial relief from legal uncertainty in situations" so that they "would no longer be put to the Hobson's choice of foregoing their rights or acting at their peril." *Tex. Emps.' Ins. Ass'n v. Jackson*, 862 F.2d 491, 505 (5th Cir. 1988) (en banc) (citation omitted). The district court properly determined that the Anti-Injunction Act does not bar Union Pacific from seeking declaratory relief.

## V.

Finally, Defendants challenge the district court's denial of their motion to dismiss for failure to join the Palestine Citizens Committee as a necessary party. Under Rule 19, a party must be joined if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>
> > (i) as a practical matter impair or impede the person's ability to protect the interest; or

---

[1] In their briefs, Defendants seemingly conflate the Anti-Injunction Act with the doctrine of collateral estoppel. We need not delve into the merits of whether this case has collateral estoppel value, but we do attempt to separate the two issues based on the legal issues raised by the parties.

> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

FED. R. CIV. P. 19(a)(1).

Defendants have presented no evidence that the Palestine Citizens Committee still exists or that any of its members are still living. It is unclear who these individuals even are. There has been no showing that disposing of this case in the absence of the Citizens Committee would "impede the . . . ability to protect" its interests or otherwise prevent a court from providing full relief. *Id.*

And, the Palestine Citizens Committee has no enforcement rights under the 1954 Agreement. The Agreement allows for Palestine and Anderson County to seek specific performance or reinstatement of the 1914 Judgment. As the district court correctly determined, without a protectable interest in the litigation, joinder is not required under Rule 19. *See HS Res., Inc. v. Wingate*, 327 F.3d 432, 439 (5th Cir. 2003) (citing *Hilton v. Atlantic Refining Co.s*, 327 F.2d 217, 219 (5th Cir. 1964) (concluding that joinder is "not required unless the judgment 'effectively precludes [the nonparties] from enforcing their rights and they are injuriously affected by the judgment.'")).

Even assuming the Palestine Citizens Committee had enforcement rights, Defendants can adequately represent the interests of the citizens who signed the Agreement, as they have the shared interest of preventing Union Pacific from leaving Palestine. S*ee Staley v. Harris Cnty. Tex.*, 160 F. App'x 410, 413 (5th Cir. 2005) (stating that "a government entity is presumed to adequately represent the interests of . . . its citizens"). The district court did not abuse its discretion in denying relief for any alleged failure to join a necessary party.

No. 21-40445

## VI.

For these reasons, we AFFIRM.